770 F.2d 791
 Jose J. OLAGUES, on Behalf of himself and all others
similarly situated, Plaintiffs-Appellants,
v.
Joseph P. RUSSONIELLO, individually and in his capacity as
United States Attorney for the Northern District
of California, et al., Defendants-Appellees.
Jose J. OLAGUES, on Behalf of himself and all others
similarly situated; Hispanic Coalition for Human Rights,
Chinese for Affirmative Action, and San Francisco Lation
Voter Registration Education Project, Plaintiffs-Appellants,
v.
Joseph P. RUSSONIELLO, individually and in his capacity as
United States Attorney for the Northern Ca; O'Malley,
William A., individually and in his capacity as District
Attorney for Contra Costa County; Underwood, Lon,
individually and in his capacity as registrar of voters for
Contra Costa County; Smith, Arlo, individually and in his
capacity as District Attorney for San Francisco County, et
al., Defendants-Appellees.
 Nos. 82-4427, 83-2581.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Sept. 12, 1984.
Decided Sept. 3, 1985.
 
 Joaquin G. Avila, Ronald T. Vera, Alan L. Schlosser, American Civil Liberties Union, San Francisco, Cal., and Kathleen A. Pool, California Rural Legal Assistance, Marysville, Cal., for plaintiffs-appellants.
 William T. McGivern, and John D. O'Connor, Tarkington, Carey, O'Connor & O'Neill, San Francisco, Cal., for defendants-appellees.
 Appeal from the United States District Court for the Northern District of California.
 Before WALLACE, ALARCON, and NELSON, Circuit Judges.
 WALLACE, Circuit Judge:
 
 
 1
 Olagues, a citizen, and certain organizations promoting the voting rights of Americans with Hispanic or Chinese ethnic backgrounds in the San Francisco Bay area (the organizations) sued for damages and declaratory and injunctive relief arising from a preliminary investigation by the United States Attorney and various state officials into possible violations of the Voting Rights Act of 1965, 42 U.S.C. Sec. 1973i(c), (d) (the Act), which prohibits the illegal registration of voters or conspiracies to illegally register voters. Olagues and the organizations claim violations of their rights under the Act and the first, fifth, fourteenth, and fifteenth amendments to the Constitution. The district court dismissed the injunctive claims on the ground that it lacked jurisdiction to enjoin an investigation by the United States Attorney. The district court also granted summary judgment in favor of the United States Attorney and the state officials on the remaining claims. We have jurisdiction pursuant to 28 U.S.C. Sec. 1291, and we affirm.
 
 
 2
 * In March and April of 1982, United States Attorney Russoniello received information from the Santa Clara county district attorney indicating that a substantial number of foreign-born individuals who had recently registered to vote were not United States citizens. The information was contained in a study of recent voter registrants whose primary language was not English. Many of the noncitizen registrants apparently believed or were told that they were entitled to vote on the basis of marriages to United States citizens or a long period of residence in the United States. Russoniello also was informed that the Spanish translation of the voter registration form erroneously stated that registrants "should be" a United States citizen, rather than stating one "must be" a citizen.
 
 
 3
 Russoniello then sent a letter on April 19, 1982, to law enforcement officers and voter registrars in nine local counties within his jurisdiction requesting their cooperation in obtaining a sampling of names from voter registration lists in order to determine whether the improper registration problem noticed in Santa Clara county was more widespread. The letter requested the forwarding of 25 names, randomly selected, of recently registered, foreign-born voters who requested bilingual ballots. The letter indicated that upon receipt of the sampling, the names would be forwarded to the Immigration and Naturalization Service (INS) to determine each individual's citizenship status. He recommended that those individuals who the INS indicated were not citizens be interviewed thereafter. Russoniello stated that he did not intend to prosecute any improperly registered voters, but that he would consider prosecuting individuals who deliberately conspired to register unqualified voters if evidence of such impropriety surfaced.
 
 
 4
 The local officials responded by forwarding the names of 168 persons, one of whom was Olagues, from the public voting lists which were subsequently checked by the INS. At Russoniello's request, local officials then conducted voluntary interviews with some of the 113 individuals whom the INS could not positively identify as citizens to determine their citizenship and, if the individuals proved not to be United States citizens, the circumstances surrounding their registration. No further investigation occurred.
 
 II
 
 5
 Because the investigation has terminated, we first must determine whether there remains a live controversy for purposes of granting equitable relief. There is no question that a controversy remains with respect to damages.
 
 
 6
 We begin this analysis with the recognition that "[p]ast exposure to illegal conduct does not in itself show a present case or controversy" for equitable relief. O'Shea v. Littleton, 414 U.S. 488, 495, 94 S.Ct. 669, 675, 38 L.Ed.2d 674 (1974) (O'Shea). Claims for equitable relief therefore become moot when the challenged activity ceases if subsequent events show that the activities "could not reasonably be expected to recur," Chinese for Affirmative Action v. Leguennec, 580 F.2d 1006, 1009 (9th Cir.1978), cert. denied, 439 U.S. 1129, 99 S.Ct. 1047, 59 L.Ed.2d 90 (1979), unless there is a possibility of "continuing, present adverse effects." O'Shea, 414 U.S. at 496, 94 S.Ct. 676.
 
 
 7
 There is a heavy burden, however, on the defendant to show that there is no reasonable expectation of repetition. United States v. W.T. Grant Co., 345 U.S. 629, 633, 73 S.Ct. 894, 897, 97 L.Ed. 1303 (1953) (W.T. Grant ). Voluntary cessation of the challenged activity by the official is insufficient to render a case moot if "the legality of the challenged practices" is still in dispute because "[t]he defendant is free to return to his old ways." Id. at 632, 73 S.Ct. at 897. See Allee v. Medrano, 416 U.S. 802, 810-11, 94 S.Ct. 2191, 2197-98, 40 L.Ed.2d 566 (1974); Walling v. Helmerich & Payne, Inc., 323 U.S. 37, 43, 65 S.Ct. 11, 14, 89 L.Ed. 29 (1944); Pomerantz v. County of Los Angeles, 674 F.2d 1288, 1291 (9th Cir.1982) (claim is moot if subsequent "events have completely and irrevocably eradicated the effects of the alleged violation"). Moreover, a case or controversy for purposes of article III may also remain live following cessation of the challenged activity if the actions are capable (1) of repetition and (2) of evading review. See, e.g., Super Tire Engineering Co. v. McCorkle, 416 U.S. 115, 122, 94 S.Ct. 1694, 1698, 40 L.Ed.2d 1 (1974). Finally, the existence of "a public interest in having the legality of the practices settled ... militates against a mootness conclusion." W.T. Grant, 345 U.S. at 632, 73 S.Ct. at 897 (emphasis added).
 
 
 8
 Applying this framework to the case before us, we find several factors pointing toward the continuing existence of a case or controversy for purposes of evaluating plaintiffs' equitable claims. First, the United States Attorney did not voluntarily cease the challenged activity because he felt that the investigation was improper. Rather, Russoniello terminated the investigation solely because it failed to produce evidence supporting any further investigative activities. Russoniello has at all times continued to argue vigorously that his actions were lawful.
 
 
 9
 Second, there has been no showing that an investigation conducted in the same manner against the same groups would not recur. Although Russoniello and the state officials point out that the Director of the Census now has determined that these counties no longer must provide bilingual ballot materials, see 49 Fed.Reg. 25,887-88 (June 25, 1984), Olagues and the organizations correctly observe that election officials in San Francisco, Santa Clara, Alameda and Monterey counties will continue to provide the same bilingual ballot materials as previously required by section 203(b) of the Voting Rights Act, 42 U.S.C. Sec. 1973aa-1a(b). Thus, Russoniello will continue to have the means available to conduct an investigation similar to the one challenged here. It is immaterial that the tools useful for discriminatory purposes are furnished by the state rather than by the federal government; what matters is whether federal officials may utilize them.
 
 
 10
 Russoniello is certainly empowered to investigate election fraud; it would not be unreasonable to believe that a similar investigation might arise at some point in the future. Thus, the same issues are capable of repetition. At the same time, these investigations, such as the one in the present case, may be of very short duration, making them effectively capable of evading review by an appellate court. E.g., Nebraska Press Association v. Stuart, 427 U.S. 539, 546-47, 96 S.Ct. 2791, 2796-97, 49 L.Ed.2d 683 (1976).
 
 
 11
 Other factors also suggest a live controversy. The organizations argue that their organizational efforts have been handicapped as a result of the fear engendered by this investigation. They contend that unless the legality of the investigation is determined, they may continue to suffer these chilling effects despite the termination of the initial investigation. Furthermore, there is a significant public interest in addressing both the appropriateness of permitting a challenge to a federal investigation, which raises separation-of-powers concerns, and the appropriateness of the investigatory methods employed, which raises voting rights and first amendment concerns.
 
 
 12
 This case is distinguishable from O'Shea and City of Los Angeles v. Lyons, 461 U.S. 95, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983) (Lyons ). In O'Shea, the plaintiffs challenged certain arrest and bail procedures employed by state law enforcement and judicial officials. In order to be subject to these alleged unlawful procedures, however, one would first have had to violate some law and then have been arrested. 414 U.S. at 496, 94 S.Ct. at 676. The Supreme Court found that plaintiffs failed to show any case or controversy because it presumed that plaintiffs would obey the law, and therefore they never would become subject to any unlawful procedures in the future. Id. at 497, 94 S.Ct. at 676. Unlike the situation before us, the O'Shea plaintiffs did not claim any constitutional right to act as they had prior to their arrest. See id. at 498, 94 S.Ct. at 677. In Lyons, the plaintiff challenged the use of chokeholds by Los Angeles police on arrestees. The Court again held that there was no case or controversy for equitable relief because whether Lyons would again be arrested and subjected to a chokehold a second time was purely speculative. See 461 U.S. at 105-06, 103 S.Ct. at 1667.
 
 
 13
 Here, Olagues and the organizations claim that the actions of the officials have interfered with their constitutionally protected first amendment activities in registering voters. Unlike O'Shea and Lyons, neither Olagues nor the organizations had to break any law in order to be subjected to alleged unlawful conduct by the officials. Certainly the legality of the investigation at issue remains in dispute; both sides continue forcefully to advocate their positions. Russoniello has never seriously attempted to make any showing that the challenged investigative techniques will never be employed again; rather, he vigorously defends his investigative tactics. Thus, he fails to meet his "heavy burden" of showing mootness. W.T. Grant, 345 U.S. at 633, 73 S.Ct. at 897.
 
 III
 
 14
 We next examine the standing of Olagues, a foreign-born citizen who requested bilingual election materials, and the organizations, which claim that the challenged investigatory activities will "effectively deny their right to participate in the electoral process."
 
 
 15
 We recently summarized the law relating to standing required by article III of the Constitution:
 
 
 16
 Standing is a threshold question in every case before a federal court. Before the judicial process may be invoked, a plaintiff must "show that the facts alleged present the court with a 'case or controversy' in the constitutional sense and that [he] is a proper plaintiff to raise the issues sought to be litigated." A party seeking to invoke the court's authority must demonstrate "such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of the issues upon which the court so largely depends...."
 
 
 17
 The question of whether the plaintiff has standing involves both constitutional and prudential limitations. The constitutional limitations of article III involve three separate but interrelated components: first, a "distinct and palpable" injury to the plaintiff, be it "threatened or actual"; second, a "fairly traceable causal connection" between that injury and the challenged conduct of the defendant; and third, a "substantial likelihood" that the relief requested will redress or prevent the injury.
 
 
 18
 McMichael v. County of Napa, 709 F.2d 1268, 1269-70 (9th Cir.1983) (citations omitted).
 
 
 19
 Olagues would generally have standing under the Act if he is an "aggrieved person," broadly defined as one who has suffered an injury. See Allen v. State Board of Elections, 393 U.S. 544, 554-57, 89 S.Ct. 817, 825-27, 22 L.Ed.2d 1 (1969) (Allen ). He has alleged an injury: his request for a bilingual ballot triggered an investigation of his records by the FBI and the INS and an interview by the local District Attorney. Juxtaposed against the holding in Allen, however, is the general bar against the invocation of federal equity jurisdiction in criminal prosecutions when the plaintiff is not being prosecuted or threatened with prosecution. See Linda R.S. v. Richard D., 410 U.S. 614, 617-19, 93 S.Ct. 1146, 1148-49, 35 L.Ed.2d 536 (1973); Younger v. Harris, 401 U.S. 37, 50-54, 91 S.Ct. 746, 753-55, 27 L.Ed.2d 669 (1971) (Younger ). In order to harmonize these conflicting strains of precedent arising in this particular factual circumstance, we find it necessary to focus on the nature of the relief sought by Olagues.
 
 
 20
 Here, Olagues is not seeking any affirmative injunctive relief in order to permit him to vote, such as demanding that he be listed as an eligible voter. Rather, he seeks to enjoin prosecutorial activities which are focused on persons other than himself. Moreover, it does not appear that Olagues has demonstrated that he would suffer irreparable harm without equitable relief. Unlike the organizations, who allege that their current voter registration efforts are being hindered by the fear that they may possibly be subject to a similar investigation in the future, the possibility that Olagues' voter registration records will be scrutinized again is entirely speculative. Olagues thus faces the barrier of Lyons, which emphasizes that the irreparable harm showing is "a requirement that cannot be met where there is no showing of any real or immediate threat that the plaintiff will be wronged again." 461 U.S. at 111, 103 S.Ct. at 1670.
 
 
 21
 Under these circumstances, we conclude that Olagues has failed to overcome the prudential limitations on standing that are particularly important when evaluating claims for equitable relief regarding a criminal investigation. The injuries he alleges are insufficient to warrant such an intrusive remedy. Since he is a citizen, it cannot be seriously contended that Olagues has been or will be denied his right to vote as a result of an examination of public records. No official action has been taken against him, other than verifying his citizenship status along with those individuals who were initially identified as improperly registered. The principal claim of present injury is that the investigation has had a "chilling effect" on and "stigmatized" him. However, mere "allegations of a subjective 'chill' " do not suffice to present a justiciable claim. Laird v. Tatum, 408 U.S. 1, 13-14, 92 S.Ct. 2318, 2325-26, 33 L.Ed.2d 154 (1972). We need not pass on the "stigma" claim as a basis for standing. The only time it could have arisen was after public disclosure that the investigation was taking place, which apparently was self-induced by the filing of this lawsuit. In the absence of standing to pursue equitable relief, Olagues' individual claim for relief is therefore relegated to one for damages only for any direct injuries which might have occurred as a result of the investigation directed at others. See Lyons, 461 U.S. at 111, 103 S.Ct. at 1670 (damage remedy is adequate when there is no showing of future injury).
 
 
 22
 The organizations' standing requires more extensive analysis. Chinese for Affirmative Action is a voluntary membership group that seeks to protect the rights of Chinese-Americans. It monitors compliance with bilingual election requirements and encourages Asian-Americans to register and to vote. The Hispanic Coalition for Human Rights is an association of Hispanic organizations and persons of Mexican descent, with a goal of securing the civil rights of Hispanics. It encourages them to register and to vote, and advises them on the availability of bilingual election materials. The San Francisco Latino Voter Registration Education Project is a coalition of Hispanic groups that was conducting a voter education and registration drive at the time of the investigation. The organizations allege that the investigation has hindered their efforts to encourage citizens of Hispanic and Chinese ethnic backgrounds to participate in the electoral process and that it was aimed at investigating how they registered voters, thus intimidating them in such activities. They also fear disclosure of their organizational membership. They claim direct injury both to themselves and to their members.
 
 
 23
 An associational plaintiff has standing to seek redress of direct injury to the organization itself. See Simon v. Eastern Kentucky Welfare Rights Organization, 426 U.S. 26, 27, 40, 96 S.Ct. 1917, 1919, 1925, 48 L.Ed.2d 450 (1976) (Simon ); Warth v. Seldin, 422 U.S. 490, 511, 95 S.Ct. 2197, 2211, 45 L.Ed.2d 343 (1975) (Warth ); NAACP v. Button, 371 U.S. 415, 428, 83 S.Ct. 328, 335, 9 L.Ed.2d 405 (1963). Under certain circumstances, an association may also be entitled to seek redress of injury to its members. See, e.g., Hunt v. Washington State Apple Advertising Commission, 432 U.S. 333, 342, 97 S.Ct. 2434, 2440, 53 L.Ed.2d 383 (1977) (Hunt ); Simon, 426 U.S. at 40, 96 S.Ct. at 1925; Warth, 422 U.S. at 511, 95 S.Ct. at 2211; Sierra Club v. Morton, 405 U.S. 727, 739, 92 S.Ct. 1361, 1368, 31 L.Ed.2d 636 (1972) (Sierra Club ). In Hunt, the Supreme Court established a three-part test to determine whether an association has standing: (1) either the group or its members must have suffered some direct, cognizable injury; (2) the interests the group seeks to protect must be "germane to the organization's purpose"; and (3) the claim or relief sought must not require the participation of the individual members in the suit. 432 U.S. at 343, 97 S.Ct. at 2441. A mere "abstract concern," Simon, 426 U.S. at 40, 96 S.Ct. at 1925, or "special interest" in a public issue, Sierra Club, 405 U.S. at 739, 92 S.Ct. at 1368, however, is legally insufficient to confer standing.
 
 
 24
 The organizations claim standing on two grounds. First, they assert a direct injury: their voter registration and educational efforts have been hindered as the direct result of the challenged investigation, in violation of their first amendment and associational rights. They claim that the investigation has discouraged members from participating in their associational activities and that it will lead to disclosure of organizational membership, thus undermining their voter education and registration efforts. Because the investigation involved questioning of voter registrants as to who had assisted them in registering, they contend, it inherently delved into their associational activities and membership in violation of their constitutional rights.
 
 
 25
 Second, the organizations assert that both they and their members are threatened with possible prosecution for violations of the Voting Rights Act. They cite Russoniello's letter as evidence that such prosecution was possible. They further assert that they are undoubtedly the targets of Russoniello's investigation and may be charged with improperly influencing ineligible persons to register.
 
 
 26
 A preliminary issue is whether the investigation may be fairly characterized as having been "targeted" at these organizations or their members. The investigation sought to determine whether there existed any unlawful conspiracies to register ineligible foreign-born voters. The random sample of voters employed focused solely on foreign-born registrants who sought bilingual ballots. Russoniello's letter indicates that groups targeting citizens of Chinese and Hispanic ethnic backgrounds were the source of his concern. Although he stated that he did not challenge their right to conduct registration drives, he did not disavow future prosecutions against persons conspiring to register noncitizens. When any voter whose name was chosen at random initially appeared to be unqualified, he sought follow-up questioning to determine who registered the voter and what representations had been made as to the qualifications necessary to vote. It is not difficult to conclude from this fact that the investigation was sufficiently "targeted" at the organizations and their members for purposes of our analysis. Their principal activities were directed specifically at registering and counseling voters who would fall within the classification on which the investigation was based. That they were not specifically named as targets does not change this conclusion.
 
 
 27
 We now analyze these organizations' standing under Hunt 's three-part test. The first hurdle is whether the groups or their members may have suffered any direct, cognizable injury. We conclude that the organizations' allegations raise sufficient claims of potential direct injury to both themselves and their members. The Supreme Court has recognized previously that a group may have standing even if it is only derivatively injured as the result of the prosecution or threat of prosecution of its members. See Allee v. Medrano, 416 U.S. 802, 829-30 & n. 6, 94 S.Ct. 2191, 2207 & n. 6, 40 L.Ed.2d 566 (1974) (Burger, J., concurring in part and dissenting in part). In the case before us, the organizations' voter education and registration efforts are unquestionably protected from unwarranted interference by prosecutorial officials; whether the investigation actually involved any unwarranted intrusions into their associational activities solely affects the merits of their claim, not their standing. Moreover, unlike Olagues, members who participated in the organizations' counseling activities and voter registration drives are potential targets of future prosecutions. Thus, the bar to invocation of federal equity jurisdiction faced by a plaintiff who is not being prosecuted or threatened with prosecution is not applicable. See Linda R.S. v. Richard D., 410 U.S. 614, 93 S.Ct. 1146, 35 L.Ed.2d 536 (1973); Younger v. Harris, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971).
 
 
 28
 The next inquiry is whether the interests the organizations seek to protect are "germane" to the purposes of the organizations. Hunt, 432 U.S. at 343, 97 S.Ct. at 2441. We conclude that they are. The organizations' activities are centered on voter education and registration. Such activities are directly related to the individual members' interests in pursuing counseling and registration of voters free from unwarranted prosecutorial intrusions.
 
 
 29
 Finally, the relief sought by the organizations does not require the participation of individual members in the suit. The principal claims are for injunctive and declaratory relief; such equitable relief is particularly suited for group representation. See Warth, 422 U.S. at 515, 95 S.Ct. at 2213. Thus, we conclude that the organizations have standing.
 
 IV
 
 30
 Although a case may not be moot, a plaintiff still has the burden of showing that equitable relief is necessary, see W.T. Grant, 345 U.S. at 633, 73 S.Ct. at 897, and the mere possibility of future injury is insufficient to enjoin official conduct. Moreover, there must be "a strong showing of abuse" of discretion to overturn a denial of such relief. Id. We also keep in mind the Supreme Court's admonition that any injunction regarding government functions is generally only permitted in "extraordinary circumstances," Rizzo v. Goode, 423 U.S. 362, 379, 96 S.Ct. 598, 608, 46 L.Ed.2d 561 (1976), as officials should be given the "widest latitude" possible while performing their official duties. Id. at 378, 96 S.Ct. at 607.
 
 
 31
 The organizations seek to enjoin a preliminary investigation of a United States Attorney. The district court dismissed the organizations' complaint on the grounds that "as a matter of law," it lacked "jurisdiction to enjoin or otherwise control" such an investigation. We review the legal question of jurisdiction de novo. E.g., United States v. Oregon, 718 F.2d 299, 303 & n. 5 (9th Cir.1983). The district court erred in its ruling that it lacked jurisdiction. See, e.g., Jett v. Castaneda, 578 F.2d 842, 845 (9th Cir.1978) (Jett).
 
 
 32
 We have recognized, however, that as a general proposition, a district court has no "power to monitor executive investigations before a case or controversy arises." Jett, 578 F.2d at 845. See also United States v. Cox, 342 F.2d 167, 171 (5th Cir.) (en banc) ("courts are not to interfere with the free exercise of the discretionary powers of the attorneys of the United States in their control over criminal prosecutions"), cert. denied, 381 U.S. 935, 85 S.Ct. 1767, 14 L.Ed.2d 700 (1965). We emphasized that intrusions into the investigative process of a United States Attorney present "difficult problems of separation of powers." Jett, 578 F.2d at 845. We therefore recognized that only in extraordinary circumstances would we entertain an action to enjoin a prosecutor's investigatory activities. See id. ("prosecutor may be subject to a suit to enjoin egregiously illegal conduct"). See also United States v. Chanen, 549 F.2d 1306, 1313 (9th Cir.) ("a court may not exercise its 'supervisory power' in a way which encroaches on the prerogatives of [a prosecutor] unless there is a clear basis in fact and law for doing so," because of separation of powers constraints), cert. denied, 434 U.S. 825, 98 S.Ct. 72, 54 L.Ed.2d 83 (1977) (Chanen).
 
 
 33
 The organizations alleged that the United States Attorney lacked a reasonable basis for initiating the investigations. The district court should therefore have determined whether any extraordinary circumstances were present. Because we may affirm the district court's ruling on any basis fairly presented by the record, however, see Keniston v. Roberts, 717 F.2d 1295, 1300 n. 3 (9th Cir.1983), we consider whether there were extraordinary circumstances, Jett, 578 F.2d at 845, present requiring injunctive relief. We conclude that no extraordinary circumstances are suggested in the record, as indicated in our discussion in Part V. Because we hold that injunctive relief would not be appropriate, we need not determine whether, as Olagues and the organizations claim, an action for such relief may lie against federal officials under the Act itself.
 
 
 34
 Other courts have been equally reluctant to intrude into the sphere of prosecutorial authority. See Reporters Committee for Freedom of the Press v. American Telephone & Telegraph, 593 F.2d 1030, 1065 (D.C.Cir.1978) ("Only the most extraordinary circumstances warrant anticipatory judicial involvement in criminal investigations."), cert. denied, 440 U.S. 949, 99 S.Ct. 1431, 59 L.Ed.2d 639 (1979) (Reporters Committee); LaRouche v. Webster, 566 F.Supp. 415, 417 (S.D.N.Y.1983) ("party seeking to enjoin a criminal investigation bears an almost insurmountable burden") (LaRouche); accord In re Grand Jury of the Southern District of Alabama, 508 F.Supp. 1210, 1214 (S.D.Ala.1980); In re Grand Jury Subpoena to Central States, 225 F.Supp. 923, 925 (N.D.Ill.1964).
 
 
 35
 Only one court has actually found the presence of sufficiently extraordinary circumstances. In Pollard v. Roberts, 283 F.Supp. 248 (E.D.Ark.), aff'd, 393 U.S. 14, 89 S.Ct. 47, 21 L.Ed.2d 14 (1968) (per curiam), the district court enjoined the enforcement of a subpoena requiring the disclosure of contributions to a political party. Such disclosure of what was then considered confidential data would have resulted in immediate, irreparable harm to the plaintiffs' clear first amendment interests. As a result, the court placed a minimal burden on the prosecutor to show that the subpoena was rationally related to a legitimate investigation, 283 F.Supp. at 256, a burden that he failed to meet. Id. at 257.
 
 
 36
 Courts have rejected attempts to interfere with an investigation by a United States Attorney in two similar instances. In LaRouche, contributors and organizations supporting a Congressman sued for injunctive and declaratory relief in regard to an investigation into his campaign. The investigation was triggered by a series of newspaper stories indicating potentially illegal campaign financing activities. Plaintiffs argued that the investigation was in bad faith with the intention of both chilling the plaintiffs' exercise of their first amendment rights of association and discouraging future contributions. The United States Attorney's activities had been limited to questioning various contributors. After noting the "almost insurmountable burden" plaintiffs faced, the district court emphasized that: "The decision to investigate, like the decision to prosecute, is one which the Constitution places in the executive branch. The constitutional separation of powers prevents the courts from interfering with the exercise of prosecutorial discretion except under the rarest of circumstances." 566 F.Supp. at 417. That court limited its review to a determination of whether there was "reasonable cause to believe that criminal activity may have taken place." Id. at 418. Beyond that, the court held that it was not its function to examine the "wisdom" or "motives" behind the decision to investigate. Id. In denying all of plaintiffs' claims for relief, the court found that the mere "possibility of criminal activity" as alleged in the newspaper articles was "sufficient to justify a criminal investigation." Id. Because the plaintiff made no showing of future investigatory misconduct, an injunction with respect to future investigations was also denied. Id. at 419. As to the fear that first amendment rights were being chilled, the court emphasized that the "compelling governmental interest in investigating possible" crime overrode such interests and that "the mere asking of material questions does not constitute a First Amendment violation." Id. at 418. See also Jones v. Unknown Agents of the Federal Election Commission, 613 F.2d 864, 877-78 (D.C.Cir.1979) (reasonable questioning by Commission agents about campaign contributions does not chill first amendment rights), cert. denied, 444 U.S. 1074, 100 S.Ct. 1019, 62 L.Ed.2d 755 (1980).
 
 
 37
 Reporters Committee involved two newspapers which sought injunctive and declaratory relief from a telephone company policy of providing toll call records to law enforcement officials, claiming first and fourth amendment violations. The court held that the first amendment provided no additional "shield" respecting privacy interests beyond the fourth amendment's protection in the context of a good faith criminal investigation. 593 F.2d at 1054-55, 1058. The court emphasized the "particularly heavy burden" on plaintiffs demanding equitable relief in such circumstances dictated by separation of powers concerns, id. at 1065, and that mere speculation as to irreparable harm would not suffice. Id. at 1067. In order to meet the burden, plaintiffs would have to establish "a clear and imminent threat of future [prosecutorial] misconduct." Id. at 1071.
 
 V
 
 38
 Plaintiffs urge that the preliminary investigation in this case should be reviewed by this court with "heightened scrutiny" because it focused on a "suspect class" and because a fundamental right is burdened. We disagree.
 
 
 39
 Initially, the organizations argue that a classification based on an individual's choice of language is a form of discrimination based on race or national origin. No court has yet held that a language-based classification is the equivalent of one based on race or national origin requiring heightened scrutiny as a "suspect class." Indeed, those courts which have faced this issue have held that language-based classifications are not the equivalent of national origin classifications. See Soberal-Perez v. Heckler, 717 F.2d 36, 41 (2d Cir.1983), cert. denied, --- U.S. ----, 104 S.Ct. 1713, 80 L.Ed.2d 186 (1984); Frontera v. Sindell, 522 F.2d 1215, 1219-20 (6th Cir.1975); see also Garcia v. Gloor, 618 F.2d 264, 268 (5th Cir.1980) ("Neither [Title VII] nor common understanding equates national origin with the language one chooses to speak."), cert. denied, 449 U.S. 1113, 101 S.Ct. 923, 66 L.Ed.2d 842 (1981). We agree with these courts and hold that a language-based classification is not the equivalent of a national origin classification, and does not denote a suspect class.
 
 
 40
 Unlike race, place of birth, or sex, language is not one of those "immutable characteristic[s] determined solely by the accident of birth" which typically are the basis for finding a suspect class. Frontiero v. Richardson, 411 U.S. 677, 686, 93 S.Ct. 1764, 1770, 36 L.Ed.2d 583 (1973). Although our first choice of language may be initially determined to some extent "by the accident of birth," id., we remain free thereafter to choose another should we decide to undertake the initiative. Indeed, bilingualism or multilingualism is hardly an extreme rarity today, as Olagues's own bilingualism exemplifies. Moreover, even if a significant percentage of those speaking a particular language can be shown to be of one "discrete and insular" racial or ethnic minority, United States v. Carolene Products Co., 304 U.S. 144, 152 n. 4, 58 S.Ct. 778, 783 n. 4, 82 L.Ed. 1234 (1938), not all persons speaking that language would be so situated. The court would thus face the problem of blurred lines defining those persons entitled to heightened protection from use of the challenged classification, with the possibility of overbroad protection leading to the striking down of otherwise rationally based official action. The organizations' request therefore urges us "to extend its most exacting scrutiny to review [government action] that allegedly discriminates against a large, diverse, and amorphous class, unified only by the common factor" of language. San Antonio School District v. Rodriguez, 411 U.S. 1, 28, 93 S.Ct. 1278, 1293, 36 L.Ed.2d 16 (1973). We agree that within a society "of multitudinous origins, customs, tongues, beliefs, and cultures, ... [i]t would hardly take extraordinary ingenuity for a lawyer to find 'insular and discrete' minorities at every turn in the road." Sugarman v. Dougall, 413 U.S. 634, 657, 93 S.Ct. 2842, 2865, 37 L.Ed.2d 853 (1973) (Rehnquist, J., dissenting). We therefore decline to equate one's choice of language with one's race or national origin, classification on the basis of which would require exacting scrutiny.
 
 
 41
 Heightened scrutiny is also appropriate if a fundamental right is burdened, and voting is considered a fundamental right. E.g., Dunn v. Blumstein, 405 U.S. 330, 336, 92 S.Ct. 995, 999, 31 L.Ed.2d 274 (1972). It is difficult to see how any "burden" was placed on anyone's right to vote, however, since no individual citizen was denied his right to vote. Russoniello's preliminary inquiry was aimed at ferreting out potential voting fraud, in order to enhance the right to vote of those who qualified. Individual citizens who were initially identified as not qualified thereafter were only the subject of narrowly confined, noncoercive follow-up interviews probing potentially unlawful activities of others. Even if we construe this as a "burden," it is a burden that all citizens must be asked to bear when they are potential witnesses to unlawful conduct.
 
 
 42
 The organizations' first amendment claims are equally lacking in substance. Whatever incidental burden (if any) on their associational rights which may have occurred must give way to the government's need to ensure the sanctity of the polls. See, e.g., LaRouche, 566 F.Supp. at 418 ("associational rights ... [often] must give way to compelling governmental interests in investigating possible criminal activity"). Investigative activity inherently "affects or 'implicates' First Amendment activity." Reporters Committee, 593 F.2d at 1059 (emphasis omitted). The review of public records cannot involve any violation of first amendment rights. Moreover, the follow-up questioning of potential witnesses also is lawful. See, e.g., Jones v. Unknown Agents of the Federal Election Commission, 613 F.2d 864, 877-78 (D.C.Cir.1979) (upholding questioning of campaign contributors regarding illegal contributions), cert. denied, 444 U.S. 1074, 100 S.Ct. 1019, 62 L.Ed.2d 755 (1980); LaRouche, 566 F.Supp. at 418 ("As long as reasonable cause to investigate exists, the mere asking of material questions does not constitute a First Amendment violation.").
 
 
 43
 When no "suspect class" is involved and no fundamental right is burdened, a rational basis test is used to determine the legitimacy of the classification. See Massachusetts Board of Retirement v. Murgia, 427 U.S. 307, 311-12, 96 S.Ct. 2562, 2565-66, 49 L.Ed.2d 520 (1976) (per curiam). Here, the scope of the investigation was limited to recently-registered foreign-born voters seeking bilingual ballots. The impetus for the investigation was a study indicating problems with persons whose primary language was other than English, in part because of mistranslations in the Spanish language applications. The initial review was randomly based among this group in order to readily obtain some indication of the scope of any impropriety. When no significant level of impropriety was noticed, the investigation was terminated. Thus, it appears to have been reasonably limited in both its scope and its use of classifications.
 
 
 44
 We realize that the separation of powers doctrine does not require us to ignore any and all activities by executive officials regardless of whether their actions constitute clear violations of individual rights. At the same time, however, even the organizations recognize that a United States Attorney is entitled, indeed required, to conduct an investigation into allegations of voting fraud. They only quarrel with the scope and manner of the investigation subsequently undertaken. But ours is not the role of a "super prosecutor" empowered to monitor all prosecutorial activities on a day-to-day basis, absent compelling, extraordinary circumstances. Chanen, 549 F.2d at 1312-13.
 
 
 45
 We only hold that on the facts of this case, no such extraordinary circumstances exist warranting intrusion into the actions of the executive branch. This is not to say that the organizations' charges are not serious; we reach this conclusion only after careful scrutiny of the record before us. We are compelled, however, to refrain from injecting ourselves into the midst of what essentially was only an embryo of an investigation. A narrowly focused preliminary inquiry using public records was undertaken in order for the United States Attorney to determine whether a problem even existed. Without the ability to make such a narrow inquiry, in the face of a study indicating potentially significant voter registration problems, the United States Attorney would be deprived of the information he needs to perform his duties. The organizations would have us either forbid any preliminary investigation, or mandate one of significantly broader scope. But matters such as the scope of a preliminary investigation are delegated to the sound discretion of the executive branch.
 
 VI
 
 46
 The organizations also sought declaratory relief. The district court dismissed this claim without elaborating its reasons. The decision whether to grant declaratory relief is within the sound discretion of the district court. See, e.g., Doe v. Gallinot, 657 F.2d 1017, 1024-25 (9th Cir.1981).
 
 
 47
 Declaratory relief may be appropriate even when injunctive relief is not. See Steffel v. Thompson, 415 U.S. 452, 469, 94 S.Ct. 1209, 1220, 39 L.Ed.2d 505 (1974) (Steffel ). There is a considerable difference between ordering a government official to conduct his activities in a certain manner, and simply pronouncing that his conduct is unlawful and should be corrected. Nevertheless, there remains the concern that an award of declaratory relief in favor of the organizations could later provide grounds for seeking injunctive relief against the same officials should the organizations believe they are again the targets of a similar investigation, see Samuels v. Mackell, 401 U.S. 66, 72, 91 S.Ct. 764, 767, 27 L.Ed.2d 688 (1971) (Samuels ), even though the investigative techniques may not be identical. Therefore, if declaratory relief based on a lesser showing leads to an injunction, the distinction between the two types of relief would be lost, despite the strong policy disfavoring such disruptive relief which we previously outlined. See Steffel, 415 U.S. at 481-82 & n. 3, 94 S.Ct. at 1226-27 & n. 3 (Rehnquist, J., concurring) (expressing concern over potential use of declaratory relief as a bootstrap).
 
 
 48
 Thus, the Supreme Court has recognized that "ordinarily a declaratory judgment will result in precisely the same interference with and disruption of" law enforcement activities as an injunction, Samuels, 401 U.S. at 72, 91 S.Ct. at 767, and therefore " 'the practical effect of [injunctive and declaratory] relief will be virtually identical.' " Doran v. Salem Inn, Inc., 422 U.S. 922, 931, 95 S.Ct. 2561, 2567, 45 L.Ed.2d 648 (1975), quoting Samuels, 401 U.S. at 73, 91 S.Ct. at 768. Notwithstanding the difference in effect between injunctive and declaratory relief, we conclude that the same general equitable principles should apply here in determining whether to grant declaratory relief as to the lawfulness of Russoniello's investigation. See Samuels, 401 U.S. at 73, 91 S.Ct. at 768.
 
 
 49
 The central purpose of the Declaratory Judgment Act, 28 U.S.C. Secs. 2201-2202, is to provide parties with a declaration of their rights prior to incurring actual injury. In the typical case requesting declaratory relief with respect to law enforcement officials, a declaration of rights is sought with respect to a party's ongoing or intended conduct in light of existing criminal statutes. The party desires a declaration that his conduct is lawful, and therefore may not be interfered with by state or federal officials. See Steffel, 415 U.S. at 478, 94 S.Ct. at 1225 (Rehnquist, J., concurring). Declaratory relief thus provides an "alternative to pursuit of the arguably illegal activity." Id. at 480, 94 S.Ct. at 1226. Here, however, there is no claim seeking a declaration that the organizations' voter registration activities are lawful. Rather, they seek a declaration that the government's activities are unlawful. Thus, the organizations are not seeking any alternative to being forced to continue arguably lawful conduct with the fear of imminent criminal prosecution. E.g., Doran v. Salem Inn, Inc., 422 U.S. 922, 95 S.Ct. 2561, 45 L.Ed.2d 648 (1975).
 
 
 50
 In these circumstances, we hold that the district court's denial of declaratory relief was not an abuse of discretion. The organizations were not generally hindered from pursuing their lawful voter registration activities at the risk of imminent criminal prosecution, unlike the restaurant owners in Doran. Declaratory relief in this action would raise the same concerns regarding interference with the activities of prosecuting officials that we pointed out in our discussion of injunctive relief.
 
 VII
 
 51
 The separation of powers concerns with regard to equitable relief against a United States Attorney are absent when examining the appropriateness of equitable relief against the county officials. But similar considerations of restraint in ordering such relief arise out of principles of comity and federalism, as emphasized in Lyons, O'Shea, and Younger. "[R]ecognition of the need for a proper balance between state and federal authority counsels restraint in the issuance of injunctions against state officers engaged in the administration of the States' criminal laws...." Lyons, 461 U.S. at 112, 103 S.Ct. at 1670, citing O'Shea, 414 U.S. at 499, 94 S.Ct. at 677, and Younger, 401 U.S. at 46, 91 S.Ct. at 751. "[N]ormal principles of equity, comity, and federalism ... should inform the judgment of federal courts when asked to oversee state law enforcement authorities." Lyons, 461 U.S. at 112, 103 S.Ct. at 1670. Here, the actions of the county officials of which the organizations complain were all performed at the specific request of the United States Attorney. Enjoining the county officials' activities would thus, to some effect, enjoin the United States Attorney from pursuing his investigation. Because we find no basis for interfering with the United States Attorney's investigation, we find no basis for equitable relief concerning the means he has to conduct it. Cf. Gravel v. United States, 408 U.S. 606, 621, 92 S.Ct. 2614, 2625, 33 L.Ed.2d 583 (1972) (committee counsel gathering information for congressman is entitled to invoke congressional immunity).
 
 
 52
 Even absent these concerns, the organizations' claims under the Voting Rights Act against these officials do not appear to have merit. Assuming that the search of voting records intimidated bilingual voters, such intimidation would satisfy only one part of a two-pronged test for violations of 42 U.S.C. Secs. 1971(b) and 1973i(b): the voters and organizations were intimidated, but the officials did not intend to intimidate. See United States v. McLeod, 385 F.2d 734, 740-41 (5th Cir.1967). As we discuss in Part IX, the officials acted in good faith. Although a declaratory judgment for violation of 42 U.S.C. Sec. 1973aa-1a could not be denied on the basis of intent, see Chinese for Affirmative Action, 580 F.2d at 1008-09 (good faith is no defense to equitable relief regarding bilingual ballot provisions), there has been no violation of this section, which concerns solely the provision of bilingual ballots. There has been no allegation that bilingual ballots have not been provided in accordance with that section.
 
 VIII
 
 53
 The organizations' First Amended Complaint seeks "statutory damages" under the Voting Rights Act. Pursuant to Allen v. State Board of Elections, 393 U.S. 544, 555, 89 S.Ct. 817, 826, 22 L.Ed.2d 1 (1969), private litigants are held to have an action against state officials for declaratory and injunctive relief under section 5 of the Act, 42 U.S.C. Sec. 1973c.
 
 
 54
 The Act, however, does not specify any statutory damage remedies. No case has been cited nor have we found one in which damages were recovered. In determining whether to construe an implied cause of action, the principal focus must be on congressional intent. Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran, 456 U.S. 353, 377, 102 S.Ct. 1825, 1838, 72 L.Ed.2d 182 (1982). The Act itself limits the recovery of any fine for criminal sanctions to $5,000. See 42 U.S.C. Sec. 1973aa-3. The legislative history nowhere suggests any action for damages, but instead observes that a private litigant is entitled to "the same remedy" as the Attorney General, as well as attorneys' fees as in 42 U.S.C. Secs. 1981-1988. S.Rep. No. 295, 94th Cong., 1st Sess. 39-43, reprinted in 1975 U.S.Code Cong. & Ad.News 774, 806-10. That history points out that "[t]he sole consequence" of the provision for a private cause of action under the Act "is to broaden the scope of equitable relief which may be requested" to include the "special remedies" specified in the Act. Id. at 49, reprinted in 1975 U.S.Code Cong. & Ad.News at 816 (emphasis added).
 
 
 55
 Moreover, Supreme Court precedent suggests that private plaintiffs are limited to damage actions under 42 U.S.C. Sec. 1983. See Smith v. Allwright, 321 U.S. 649, 64 S.Ct. 757, 88 L.Ed.2d 987 (1944). In Smith, plaintiffs were awarded damages for violation of their voting rights under 8 U.S.C. Sec. 31 (now echoed in 42 U.S.C. Sec. 1973), in a suit under 8 U.S.C. Sec. 43 (now codified at 42 U.S.C. Sec. 1983). Equitable relief suffices to fulfill the purpose of the statute, which is to ensure the right to register and vote at the polls. See, e.g., Webber v. White, 422 F.Supp. 416, 426 (N.D.Tex.1976) ("the most relief that a federal district court can grant to a private litigant under the Allen interpretation of 42 U.S.C. Sec. 1973c" is declaratory and injunctive relief). We decline to imply any action for damages.
 
 IX
 
 56
 There is also an issue of whether the organizations' complaint can be read fairly to include a request for damages based on constitutional claims or statutory claims such as section 1983, 42 U.S.C. Sec. 1983. We agree with the district court, however, that the officials involved in this action would be entitled to immunity from such damage claims.
 
 
 57
 Under Imbler v. Pachtman, 424 U.S. 409, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976), state prosecutors are absolutely immune from damage suits with respect to their quasi-judicial activities. Federal prosecutors receive the same protection. Butz v. Economou, 438 U.S. 478, 516-17, 98 S.Ct. 2894, 2915-16, 57 L.Ed.2d 895 (1978). Other executive officials are entitled to qualified immunity, see, e.g., Scheuer v. Rhodes, 416 U.S. 232, 247-49, 94 S.Ct. 1683, 1691-92, 40 L.Ed.2d 90 (1974) (state executive officials), as are prosecutorial activities that are merely administrative or investigative. Jacobson v. Rose, 592 F.2d 515, 524 (9th Cir.1978), cert. denied, 442 U.S. 930, 99 S.Ct. 2861, 61 L.Ed.2d 298 (1979).
 
 
 58
 We have previously employed Imbler's functional approach for determining the degree of immunity for prosecutorial activity. See Ybarra v. Reno Thunderbird Mobile Home Village, 723 F.2d 675, 678 (9th Cir.1984). Quasi-judicial activities are not limited to post-indictment matters, but also include "[i]nvestigative functions carried out pursuant to the preparation of a prosecutor's case." Freeman on Behalf of the Sanctuary v. Hittle, 708 F.2d 442, 443 (9th Cir.1983) (per curiam). See also Atkins v. Lanning, 556 F.2d 485, 488-89 (10th Cir.1977) (per curiam).
 
 
 59
 The district court held that the actions in question were investigatory rather than prosecutorial in nature. The limited investigative activities undertaken by Russoniello, however, may be encompassed within those activities essential to the initiation of a prosecution. His decision to request a sampling of voting records can hardly be described as a purely administrative act. The Third Circuit has highlighted this aspect of a prosecutor's duties:
 
 
 60
 We recognize that the decision of the Attorney General, or a prosecuting attorney, to initiate a prosecution is not made in a vacuum. On occasion, the securing of additional information may be necessary before an informed decision can be made. To grant a prosecuting attorney absolute immunity over his decision to initiate a prosecution while subjecting him to liability for securing the information necessary to make that decision would only foster uninformed decisionmaking and the potential for needless actions. We believe the right to make the decision without being subject to suit must include some limited right to gather necessary information.
 
 
 61
 Forsyth v. Kleindienst, 599 F.2d 1203, 1215 (3d Cir.1979), cert. denied, 453 U.S. 913, 101 S.Ct. 3147, 69 L.Ed.2d 997 (1981).
 
 
 62
 We need not determine whether the district court erred in denying absolute immunity, because we agree that all those sued are entitled at least to qualified, good faith immunity. The controlling standard is "the objective reasonableness of an official's conduct, as measured by reference to clearly established law." Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). Moreover, summary judgment is encouraged as an appropriate tool to "avoid excessive disruption of government." Id.
 
 
 63
 Under this objective standard, all the officials are entitled to immunity. The county officials did no more than submit information in the public record to the United States Attorney at his request, with some later, voluntary interviews of those voters whose citizenship the INS was unable to ascertain. Such actions do not violate any "clearly established" rights. Examining information in the public record violates no one's rights. The Northern District Director of the INS, David Ilchert, similarly did no more than provide information to Russoniello that was available to anyone on request.
 
 
 64
 Russoniello's actions were limited to conducting a preliminary investigation of potential voting fraud by examining and cross-checking public records. The limited scope of the investigation was reasonably related to his need to secure a preliminary indication of the scope of potential illegalities. No further activities were undertaken or contemplated. These actions also violated no individual's "clearly established" rights; indeed, it was Russoniello's duty to perform this investigation under the Voting Rights Act.
 
 
 65
 The organizations' claims rest entirely on their contention that an investigation using a language-based classification to define its scope is subject to strict scrutiny as invidious discrimination on the basis of national origin. This contention is further dependent upon a finding that the illegality of using such a classification was "clearly established." See Capoeman v. Reed, 754 F.2d 1512, 1514 (9th Cir.1985) (establishing framework for determining whether a right was clearly established for purposes of qualified immunity). We already have concluded that such a classification does not call for strict scrutiny. But even if it did, the illegality of such a classification was not "clearly established." The district court's order finding qualified immunity for all federal and state officials sued is therefore affirmed.
 
 
 66
 AFFIRMED.
 
 
 67
 NELSON, Circuit Judge, concurring and dissenting;
 
 
 68
 I agree that the controversy is not moot (section II), that the organizations have standing (section III), and that the defendants are entitled to good faith immunity from damages under 42 U.S.C. Sec. 1983 (section IX). I dissent from the holdings that Olagues lacks standing (part of section III), that "extraordinary circumstances" are required to enjoin an investigation that infringes upon First Amendment rights (section IV), that heightened scrutiny is not warranted for the equal protection claim (section V), that declaratory and injunctive relief should be judged under the same standards (section VI), and that the plaintiffs have no claims under the Voting Rights Act (sections VII and VIII). I would remand on the injunction and one Voting Rights Act claim, and reverse the denial of a declaratory judgment which provides that the investigation violated the Equal Protection Clause. For clarity and brevity, I will limit my comments on this complex case to these issues.
 
 
 69
 Standing should not be denied to Olagues. Neither rationale employed by the majority is convincing. The prudential analysis speaks of "equitable relief" but then considers solely the request for an injunction, ignoring the declaratory relief sought. The majority concedes that Olagues has alleged an injury, but then categorizes the harm as "subjective" and therefore nonjusticiable under Laird v. Tatum, 408 U.S. 1, 92 S.Ct. 2318, 33 L.Ed.2d 154 (1972). Yet Laird recognizes that when the complainant is subject to the challenged exercise of government power, whereby the government improperly imposed an affirmative obligation likely to have a deterrent effect on the exercise of his rights, Lamont v. Postmaster General, 381 U.S. 301, 308, 85 S.Ct. 1493, 1497, 14 L.Ed.2d 398 (1965), the requirements of standing are met. Laird, 408 U.S. at 11-13, 92 S.Ct. at 2324-25 (citing Lamont).
 
 
 70
 Olagues satisfies the requisites of standing under the very case upon which the majority relies. See McMichael v. County of Napa, 709 F.2d 1268, 1269-70 (9th Cir.1983). The burden which Olagues alleges upon his exercise of the franchise--that his request for a bilingual ballot triggered an investigation of him by the INS, the FBI, and the United States Attorney, and an interview with the local District Attorney at which he was to prove his citizenship--is concrete. He has a personal stake in the controversy and the relief requested would prevent the injury from recurring. Moreover, the majority's suggestion that any stigma attributable to the government's action was Olagues' own fault, because all publicity concerning the investigation resulted from the filing of this lawsuit, has neither legal support nor a factual basis in the record.
 
 
 71
 The majority accords standing to the organizations because the investigation threatened their members. The identical threat is posed to the group of voters to which Olagues belongs--Hispanic citizens who request bilingual ballots. This language minority group is explicitly protected against voting discrimination. See 42 U.S.C. Sec. 1973b(f)(2). The injury to Olagues as a member of this group is another ground for his standing under the Equal Protection Clause. See United Jewish Organizations of Williamsburgh, Inc. v. Wilson, 510 F.2d 512, 522 (2d Cir.1975).
 
 
 72
 The majority misstates the standard for injunctive relief in this context. Instead of the "extraordinary circumstances" threshold, drawn from federalism and criminal cases,[1] this investigation should have been enjoined if it lacked a reasonable basis or was initiated in bad faith. See Branzburg v. Hayes, 408 U.S. 665, 699-701, 707-08, 92 S.Ct. 2646, 2665-2666, 2669-2670, 33 L.Ed.2d 626 (1972); Reporters Committee for Freedom of the Press v. American Telephone & Telegraph, 593 F.2d 1030, 1064 (D.C.Cir.1978), cert. denied, 440 U.S. 949, 99 S.Ct. 1431, 59 L.Ed.2d 639 (1979); Pollard v. Roberts, 283 F.Supp. 248, 256-58 (E.D.Ark.), aff'd, 393 U.S. 14, 89 S.Ct. 47, 21 L.Ed.2d 14 (1968) (per curiam ). The First Amendment protects citizens from investigations which do not meet this "reasonable basis" standard. Pollard, 283 F.Supp. at 258; Reporters Committee, 593 F.2d at 1064. See also Branzburg v. Hayes, 408 U.S. 665, 699-701, 707-08, 92 S.Ct. 2646, 2665-2666, 2669-2670, 33 L.Ed.2d 626 (1972).
 
 
 73
 The organizations alleged that the United States Attorney lacked a reasonable basis for initiating the investigations. The district court should have made a finding on this issue. See La Rouche v. Webster, 566 F.Supp. 415, 418 (S.D.N.Y.1983); Pollard, 283 F.Supp. at 258. The relief sought by the organizations was not anticipatory, since the investigation presented a current case or controversy. Cf. Jett v. Castaneda, 578 F.2d 842, 845 (9th Cir.1978) (no case or controversy); Reporters Committee, 593 F.2d at 1065. The denial of the preliminary injunction should be affirmed, therefore, only if the organizations failed to show that the investigation was not reasonable or initiated in bad faith. The question should be remanded.
 
 
 74
 Contrary to the majority's view, declaratory relief raises different concerns than an injunction. To quote one case cited by the majority, "critical distinctions make declaratory relief appropriate where injunctive relief would not be." Steffel v. Thompson, 415 U.S. 452, 481, 94 S.Ct. 1209, 1226, 39 L.Ed.2d 505 (1974) (Rehnquist, J., concurring). The majority echoes the mistake of the panel which was reversed in Steffel for holding that a failure to demonstrate irreparable injury precluded the granting of declaratory relief. Id. at 471-72, 94 S.Ct. at 1221-22. It reasons that where injunctive relief is inappropriate, declaratory relief should also be denied, because "an award of declaratory relief in favor of the organizations could later provide grounds for seeking injunctive relief against the same officials should the organizations believe they are again the targets of a similar investigation." This concern is misplaced, because an injunction should issue if the government so flouts a judgment declaring certain action unconstitutional. Declaratory relief is a separate remedy to be awarded when warranted, even if an injunction under the same circumstances would be denied. Steffel, 415 U.S. at 471-72, 94 S.Ct. at 1221-22.
 
 
 75
 This case warrants the award of a declaratory judgment under the Constitution. The investigation fails before the scrutiny required for a classification which burdens the voting rights of a suspect class.
 
 
 76
 The majority recognizes that the investigation targeted "recently registered, foreign-born voters who requested bilingual ballots," at ----, but then analyzes the class as if it were defined solely by language ability. The classification was of those who requested bilingual ballots, not just of individuals who speak more than one language, and it included two other factors--foreign birth and recent registration to vote. The class should be analyzed as defined by these three characteristics.
 
 
 77
 Foreign birth is "an immutable characteristic determined solely by an accident of birth," Frontiero v. Richardson, 411 U.S. 677, 686, 93 S.Ct. 1764, 1770, 36 L.Ed.2d 583 (1973), and is similar to a national origin classification. Together with the requirement of recent registration, the target class appears composed of immigrants who have recently obtained United States citizenship but prefer Spanish or Chinese-language ballots. Like the class of Hispanics in Hernandez v. Texas, 347 U.S. 475, 74 S.Ct. 667, 98 L.Ed. 866 (1954), these characteristics taken together define a suspect class. The investigation by the FBI and INS, together with the interviews requiring proof of citizenship, amount to "different treatment" of these citizens. Such additional requirements imposed on voters "solely because of their ancestry are by their very nature odious to a free people." Hirabayashi v. United States, 320 U.S. 81, 100, 63 S.Ct. 1375, 1385, 87 L.Ed. 1774 (1943).
 
 
 78
 The fundamental right to vote was burdened by this investigation. The majority finds otherwise, perhaps because it equates "burden" with outright denial of the right to vote. Precedent does not define "burden" so narrowly, however. See, e.g., Harper v. Virginia Board of Elections, 383 U.S. 663, 666-67, 86 S.Ct. 1079, 1081, 16 L.Ed.2d 169 (1966) (poll tax constitutes burden). Nor is "denial" of the right to vote the only behavior prohibited under the Voting Rights Act. See 42 U.S.C. Sec. 1973 ("no voting qualification or prerequisite to voting, or standard, practice, or procedure ... to deny or abridge ..."); 42 U.S.C. Sec. 1973i(b) ("intimidate, threaten, or coerce").
 
 
 79
 The opinion states that "it is difficult to see how any 'burden' was placed," but I do not share this difficulty. An investigation by the FBI and INS and a summons to the district attorney to prove one's citizenship, as I noted above concerning the injury to Olagues, constitutes a burden on the exercise of the right to vote in this case. The impact of the investigation on the class went beyond any ordinary inconvenience caused to witnesses. These individuals are not fluent in English, are new to this country, and through their recent acquisition of citizenship have experienced the INS bureaucracy, which misrepresented the citizenship status of more than half of those investigated. When a citizen's request for a bilingual ballot--which is specifically made available by Congress to eliminate voting discrimination against those more comfortable in another language, Chinese for Affirmative Action v. Lequennec, 580 F.2d 1006, 1008 (9th Cir.1978), cert. denied, 439 U.S. 1129, 99 S.Ct. 1047, 59 L.Ed.2d 90 (1979)--triggers such consequences, a burden has been imposed. The Voting Rights Act forbids intimidation of voters, and in my view this investigation intimidated those foreign-born, recently registered voters who requested bilingual ballots.
 
 
 80
 Having examined the character of the classification in question and the importance of the individual interests at stake, Illinois State Board of Elections v. Socialist Workers Party, 440 U.S. 173, 183, 99 S.Ct. 983, 989, 59 L.Ed.2d 230 (1979), we examine the interests asserted in support of the classification. Id. The classification must be necessary to serve a compelling interest, and it must employ the least drastic means to achieve that end. Id. at 184-85, 99 S.Ct. at 990. This investigation cannot withstand such scrutiny. It was not narrowly tailored to catch those wrongly registered, because it targeted recently registered citizens, who are required by law to be literate in English. It assumed that individuals who speak Spanish or Chinese are likely not to be citizens, though the statistical predominance of Spanish--and Chinese-speaking citizens is the very reason why provision of bilingual ballots was required under federal law. The investigation was unconstitutional under the Equal Protection Clause, and a declaratory judgment should be granted.
 
 
 81
 Relief may also be required under the Voting Rights Act. I would remand the issue of potential violation of 42 U.S.C. Sec. 1973aa-1a. See Lequennec, 580 F.2d at 1008-09. Good faith is not a defense under this provision, which does not require intent to discriminate. Id.
 
 
 82
 Finally, even absent its legal infirmities, this investigation violated the spirit behind the Voting Rights Act, which charges the Attorney General with eradicating discrimination against language minority voters and discrimination based upon national origin. Instead, this U.S. Attorney's efforts engendered such discrimination. I cannot join the majority's wholesale affirmance of the district court's judgment.
 
 
 
 [1]
 See Rizzo v. Goode, 423 U.S. 362, 379, 96 S.Ct. 598, 608, 46 L.Ed.2d 561 (1976) (federalism issues in injunction of municipal police); Jett v. Castaneda, 578 F.2d 842, 845 (9th Cir.1978) (no immediate controversy on discovery until prosecution had commenced); United States v. Chanen, 549 F.2d 1306, 1313 (9th Cir.) (prosecutor's choice of evidence to present to grand jury), cert. denied, 434 U.S. 825, 98 S.Ct. 72, 54 L.Ed.2d 83 (1977); United States v. Cox, 342 F.2d 167, 171 (5th Cir.) (en banc) (United States Attorney arrested for contempt for refusing to sign a grand jury indictment), cert. denied, 381 U.S. 935, 85 S.Ct. 1767, 14 L.Ed.2d 700 (1965); In re Grand Jury of the Southern District of Alabama, 508 F.Supp. 1210, 1214 (S.D.Ala.1980) (prosecutorial vindictiveness); In re Grand Jury Subpoena to Central States, 225 F.Supp. 923, 925 (N.D.Ill.1964) (motion to quash grand jury subpoenas)