**DUNN McCAMPBELL ROYALTY INTEREST, INC., a Texas Corporation, Dunn–Padre Corporation, a Texas Corporation and McCampbell Minerals, Inc., a Texas Corporation, Plaintiffs,**

v.

**NATIONAL PARK SERVICE, an agency of the United States Department of Interior and Butch Farabee, in his official capacity as Superintendent for the Padre Island National Seashore, Defendants.**

Civ.A.No. C–94–105.

United States District Court,
S.D. Texas.
Corpus Christi Division.

June 20, 1995.

Dick Watt, Houston, TX, for plaintiffs.

Larry C. Marcy, U.S. Attorneys Office, Houston, TX, Charles Wendlandt, Jr., Office of U.S. Attorney, Corpus Christi, TX, for defendants.

*ORDER ON PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT, DEFENDANTS' CROSS–MOTION FOR SUMMARY JUDGMENT, DEFENDANTS' MOTION TO DISMISS TAKINGS CLAIM AND PLAINTIFFS' ORAL MOTION TO SEVER TAKINGS CLAIM*

JACK, District Judge.

On June 9, 1995, came on to be heard: (1) Plaintiffs Dunn–McCampbell Royalty Interest, Inc.'s, Dunn–Padre Corporation's and McCampbell Minerals, Inc.'s Motion for Summary Judgment against Defendants National Park Service and Butch Farabee in his official capacity as Superintendent for the Padre Island National Seashore (Butch Farabee); (2) Defendants National Park Service's and Butch Farabee's Cross–Motion for Summary Judgement against Plaintiffs Dunn–McCampbell Royalty Interest, Inc., Dunn–Padre Corporation and McCampbell Minerals, Inc.; (3) Defendants National Park Service's and Butch Farabee's Motion to Dismiss Takings Claim against Plaintiffs Dunn–McCampbell Royalty Interest, Inc., Dunn–Padre Corporation and McCampbell Minerals, Inc.; and (4) Plaintiffs Dunn–McCampbell Royalty Interest, Inc.'s, Dunn–Padre Corporation's and McCampbell Minerals, Inc.'s Oral Motion to Sever Takings Claim against Defendants National Park Service and Butch Farabee.

## I. JURISDICTION

Plaintiffs filed this action in federal district court pursuant to federal question jurisdiction under 28 U.S.C. § 1331. Additionally Plaintiffs sought jurisdiction under the Quiet Title Act, 28 U.S.C. § 2409a, the Mandamus Act, 28 U.S.C. 1361 *et seq.* and the Administrative Procedures Act, 5 U.S.C. § 702, *et seq.* For the reasons stated herein: (1) the Court DENIES Plaintiffs' Motion for Summary Judgment; (2) the Court GRANTS Defendants' Motion for Summary Judgment; (3) the Court DENIES Defendants' Motion to Dismiss Takings Claim; and (4) the Court GRANTS Plaintiffs' Oral Motion to Sever Takings Claim.

## II. LEGISLATIVE HISTORY

### 1. National Park Service Organic Act

In 1916, exercising its power under the Property Clause, Const. Art. IV, ¶ 3, cl. 2, Congress established the National Park System by enacting the National Park Service Organic Act. 16 U.S.C. § 1 *et seq.* Section 1 of the Organic Act states the purpose of the National Park system is to:

> conserve the scenery and the natural and historic objects and the wild life therein and to provide for the enjoyment of the same in such manner and by such means as will leave them unimpaired for the enjoyment of future generations.

16 U.S.C. § 1.

In addition to the units originally included within the National Park System, the Secretary of the Interior (Secretary) is directed to review other areas that "exhibit qualities of national significance" for inclusion within the National Park System and report to Congress. 16 U.S.C. § 1a–5. Congress then determines whether a candidate area is designated as a unit of the National Park Service. *Id.*

### 2. Padre Island National Seashore Enabling Legislation

In 1962, pursuant to the Property Clause and in accordance with the Park Service's Organic Act, Congress enacted the Padre Island National Seashore Enabling Legislation (Padre Enabling Act), 16 U.S.C. § 459d *et seq.,* thereby establishing a national park at the Padre Island National Seashore. The Padre Enabling Act authorized the Secretary of the Interior to acquire interests in property, 16 U.S.C. § 459d–1, and required the

Secretary to administer those interests in light of the objectives established under the Organic Act. 16 U.S.C. § 459d–4.

### 3. Texas Consent Statute

On April 4, 1963, both houses of the Texas legislature passed the Texas Consent Statute (TCS). Tex.Civ.Stat.Ann. § 6077t (Vernon 1970). The TCS codified the boundaries of the Padre Island National Seashore (National Seashore) and granted the United States permission to acquire the State owned surface estate. The TCS specifically required concurrent jurisdiction over all civil and criminal process, the right to levy and collect taxes and the right to vote. Additionally, the TCS granted consent to the United States to purchase privately held portions of the surface estate, provided such purchases would not deprive the grantor, or successor in title, the right of ingress and egress to the mineral estate. In consideration of the State's conveyance of its surface estate, the United States agreed to "establish and maintain the land ... as a National Seashore area." *Id.*

### 4. 9B Regulations

In 1979, pursuant to the Organic Act, the Secretary promulgated regulations applicable to nonfederally owned oil and gas operations in all National Park System units that require access on or through federally owned or controlled lands or waters (the 9B Regulations). 36 C.F.R. § 9.36(a). The critical component of the 9B Regulations is the requirement that an operator obtain Park Service approval of a plan of operations before commencing oil and gas exploration or production activities. 36 C.F.R. § 9.36.[1] Operators are responsible for preparing a plan of operations that addresses all information requirements applicable to proposed operations.

Operators are required to supply this information in sufficient detail to enable the Park Service to effectively analyze the impact of proposed operations on the particular unit's resources, and to determine whether to approve the proposed plan. 36 C.F.R.

§ 9.36(c). The Park Superintendent's or Regional Director's adequacy determination is administratively appealable. 36 C.F.R. § 9.49.

## III. FACTS

P.F. Dunn, Plaintiffs' predecessor in title, originally owned much of the land that is now the Padre Island National Seashore. In 1926, P.F. Dunn conveyed the surface estate to third parties, reserving the oil, gas and other mineral estates (mineral estate). Plaintiffs, or their predecessors in title, have owned this mineral estate since the 1926 conveyance.

Plaintiffs argue Defendants do not have the constitutional power and/or authority to regulate access to their mineral estate. Plaintiffs assert Texas law, rather than federal law, governs their mineral estate and that under Texas law the mineral estate is dominant to the surface estate. In so arguing, Plaintiffs contend the Padre Enabling Act and the Texas Consent Statute specifically preclude federal regulation of their mineral estate. Additionally, Plaintiffs contend case law supports their position that federal law does not preempt application of state law to their mineral estate.

Plaintiffs claim that due to the "onerous" compliance requirements of the 9B Regulations, oil companies refuse to enter leases for Plaintiffs' mineral estate on the National Seashore. However, Defendants contend they have the right to reasonably regulate the federally owned surface estate. Defendants rely upon the Property Clause, National Park Service Organic Act and Supremacy Clause to argue promulgation and application of the 9B Regulations to Plaintiffs' mineral estate is constitutionally valid. Moreover, Defendants argue Plaintiffs' complaint is procedurally inadequate.

Plaintiffs seek a declaratory judgment that Defendants have no authority to regulate or otherwise restrain access to Plaintiffs' mineral estate. In the alternative, if the Court determines Defendants have the power and

---

1. The 9B Regulations provide for exemptions from this requirement under specific circumstances. 36 C.F.R. § 9.32.

authority to regulate Plaintiffs' access to their mineral estate, Plaintiffs seek a judgment that such regulation constitutes a taking under the Fifth Amendment of the United States Constitution, entitling Plaintiffs to just compensation.

Plaintiffs and Defendants both move for summary judgment. Additionally, Defendants move to dismiss Plaintiffs' takings claim, arguing this Court has no jurisdiction over said claim pursuant to the Tucker Act, 28 U.S.C. §§ 1346(a)(2) and 1491(a).

## IV. DISCUSSION

To succeed in a motion for summary judgment, the movant must show there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law. *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1195 (5th Cir.1986). This Court must view all inferences from the summary judgment evidence in the light most favorable to the non-movant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986).

### 1. PROCEDURAL CONSIDERATIONS

#### (a) Standing

To establish standing Plaintiffs must make a three-fold showing that: (1) they have suffered some actual or threatened injury as the result of the putatively illegal conduct of Defendants; (2) the injury fairly can be traceable to the challenged action; and (3) the injury is likely to be redressed by a favorable decision. *Giddings v. Chandler*, 979 F.2d 1104, 1108 (5th Cir.1992). *See also, Valley Forge Christian College v. Americans United for Separation of Church & State, Inc.*, 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700, (1982), *Gladstone, Realtors v. Village of Bellwood*, 441 U.S. 91, 99, 99 S.Ct. 1601, 1608, 60 L.Ed.2d 66 (1979), *Simon v. Eastern Kentucky Welfare Rights Org.*, 426 U.S. 26, 38, 41, 96 S.Ct. 1917, 1924, 1925, 48 L.Ed.2d 450 (1976).

Defendants argue Plaintiffs lack standing because Plaintiffs have pled only a "chilling effect" on potential leasing activities. Plaintiffs have never been denied a permit under the 9B Regulations, nor have Plaintiffs attempted to have a plan of operations approved under the 9B Regulations. In fact, it is uncontroverted that no plan of operations has ever been denied on the Padre National Seashore.

■ Defendants cite *Olagues v. Russoniello*, 770 F.2d 791, 797 (9th Cir.1985), for the proposition that "mere 'allegations of a subjective chill' do not suffice to present a justiciable claim", *Id.* (quoting *Laird v. Tatum*, 408 U.S. 1, 13–14, 92 S.Ct. 2318, 2326, 33 L.Ed.2d 154, *reh'g denied*, 409 U.S. 901, 93 S.Ct. 94, 34 L.Ed.2d 165 (1972)). However, where the challenged exercise of governmental power is regulatory or proscriptive and the complainant is either presently or prospectively subject to the regulations challenged, standing may be established. *Laird*, 408 U.S. at 11, 92 S.Ct. at 2324–25.

■ In this case Plaintiffs challenge governmental regulatory authority to which Plaintiffs are presently, as well as prospectively subjected. Additionally, as evidence that Plaintiffs are unable to secure leases because of the 9B Regulations, Plaintiffs submit affidavits of three persons who claim NPS regulations discouraged them from pursuing leases with Plaintiffs. The Court finds Plaintiffs have met their three-fold burden in establishing standing by alleging (1) that they have suffered a concrete injury in being unable to secure leases of their mineral estate; (2) that this inability to secure leases is directly attributable to the alleged unconstitutional application of the 9B Regulations; and (3) that this injury is likely to be redressed by a favorable decision. *Giddings*, 979 F.2d at 1108.

#### (b) Quiet Title Act

Plaintiffs' complaint cites the Quiet Title Act of 1972(QTA), 28 U.S.C. § 2409a, as a basis for jurisdiction. The QTA permits the United States to be named as a defendant in a civil action "to adjudicate a disputed title to real property in which the United States claims an interest, other than a security interest or water rights." 28 U.S.C. § 2409a.

Plaintiffs have established jurisdiction under 28 U.S.C. § 1331. Therefore an analysis

of Plaintiffs' jurisdictional basis under the QTA is unnecessary.

### (c) Administrative Procedures Act

■ Plaintiffs argue the 9B Regulations, as applied to Plaintiffs' mineral estate on the Padre National Seashore, are unconstitutional. Where no specific statute grants a private cause of action, the Administrative Procedures Act (APA), 5 U.S.C. § 702, *et seq.*, waives sovereign immunity of the federal government for a plaintiff "aggrieved by agency action" to seek judicial review of final agency decisions. Under the APA a plaintiff may pursue either a "facial" challenge to the promulgation of regulations by an agency, or an "as applied" challenge to regulations when they are applied in a final agency action. *Wind River Mining Corp. v, United States,* 946 F.2d 710, 716 (9th Cir.1991). In this case, Plaintiffs argue they are asserting both a "facial" challenge and an "as applied" challenge to the 9B Regulations.

### (i) As Applied

Defendants argue an "as applied" challenge under the APA is not ripe for two reasons. First, there is no viable final agency action; second, Plaintiffs have not exhausted their administrative remedies.

### 1. FINAL AGENCY ACTION

A person invoking 5 U.S.C. § 702 must identify a specific "final agency action" that forms the basis of the request for review. *Lujan v. National Wildlife Fed'n,* 497 U.S. 871, 891, 110 S.Ct. 3177, 3190, 111 L.Ed.2d 695 (1990); *Resident Council of Allen Parkway Village v. HUD,* 980 F.2d 1043, 1055 (5th Cir.), *cert. denied,* 510 U.S. 820, 114 S.Ct. 75, 126 L.Ed.2d 43 (1993). Because Plaintiffs have not sought approval of a plan of operations under the 9B Regulations, and have never been denied approval, Defendants argue no final agency action exists.

■ Plaintiffs argue however, that rather than disputing a particular permit, the final agency action challenged is application of the 9B Regulations to Plaintiffs' mineral estate. Plaintiffs have therefore identified a final agency action ripe for judicial review.

### 2. EXHAUSTION OF ADMINISTRATIVE REMEDIES

Defendants argue Plaintiffs failed to exhaust administrative remedies regarding an "as applied" challenge. The 9B Regulations provide an administrative appeal process to be followed prior to bringing suit in federal court. 36 C.F.R. § 9.49. In this case Plaintiffs filed no administrative appeals of either the promulgation of the 9B Regulations, or application of the 9B Regulations to their mineral estate.

Defendants identify a number of policies underlying the exhaustion requirement. These policies include allowing the agency to exercise its discretion, apply its expertise and develop a factual record upon which judicial review can be based. *See McKart v. United States,* 395 U.S. 185, 195 89 S.Ct. 1657, 1663, 23 L.Ed.2d 194 (1969); *United States v. L.A. Tucker Truck Lines,* 344 U.S. 33, 37, 73 S.Ct. 67, 69, 97 L.Ed. 54 (1952); *Sweet Life v. Dole,* 876 F.2d 402, 407 (5th Cir.1989); and *Central States Southeast and Southwest Areas Pension Fund v. T.I.M.E.—DC, Inc.,* 826 F.2d 320, 328–29 (5th Cir.1987) (en banc). However, the Court finds requiring Plaintiffs to seek exhaustion in this case is unlikely to vindicate such policies. First, both sides agree this case turns upon questions of law; development of a factual record by the agency is not likely to substantially add to this legal determination. Second, this action involves constitutional issues, rather than technical issues within the agency's area of expertise. Finally, it is unlikely the agency will change its position and determine the 9B Regulations are not applicable to Plaintiffs' mineral estate.

■ Additionally, the Court recognizes exceptions to the exhaustion requirement exist where plaintiffs claim agency action is unconstitutional and/or exhaustion would be futile. *Coca–Cola Co. v. F.T.C.,* 475 F.2d 299, 303 (5th Cir.), *cert. denied,* 414 U.S. 877, 94 S.Ct. 121, 38 L.Ed.2d 122 (1973); *American General Insurance Co. v. F.T.C.,* 496 F.2d 197, 199–200 (5th Cir.1974); *McClendon v. Jackson Television, Inc.,* 603 F.2d 1174, 1177 (5th Cir.1979). Consequently, the

Court finds Plaintiffs' failure to exhaust administrative remedies does not bar this suit.

### (ii) "Facial" Challenge

Plaintiffs argue the 9B Regulations are themselves unconstitutional. The NPS promulgated the 9B Regulations in 1979 under authority of the Organic Act. 16 U.S.C. § 1 *et seq.* Section 2 of this Order discusses the substantive merits of Plaintiffs' contention Defendants lacked the power to promulgate the 9B Regulations. Procedurally, Plaintiffs' claim is barred by the statute of limitations as discussed below.

### (iii) Statute of Limitations—"As Applied" and "Facially"

■ Although Plaintiffs' claims are not barred by the doctrines of ripeness and/or failure to exhaust administrative remedies, Plaintiffs' "as applied" and "facial" challenges to the 9B Regulations are barred by the statute of limitations.

■ A six year statute of limitations applies to civil actions against the federal government. 28 U.S.C. § 2401(a) ("except as provided by the Contract Disputes Act of 1978, every civil action commenced against the United States shall be barred unless the complaint is filed within six years after the right of action first accrues"). This six year statute of limitations applies to challenges of agency actions under the APA. *Wind River Mining Corp. v. United States,* 946 F.2d 710, 715 (9th Cir.1991); *Geyen v. Marsh,* 775 F.2d 1303, 1307 (5th Cir.1985); *Sierra Club v. Penfold,* 857 F.2d 1307, 1315 (9th Cir.1988); *Shiny Rock Mining Corporation v. United States,* 906 F.2d 1362, 1364 (9th Cir.1990).

The complaint must be filed "within six years after the right of action first accrues." 28 U.S.C. § 2401(a). Therefore, the Court must determine when Plaintiffs' right of action first accrued.

In cases challenging procedural irregularities in a regulation, it has been held the right of action first accrues when the regulation is published in the Federal Register. *Shiny Rock,* 906 F.2d at 1364; *Penfold,* 857 F.2d at 1315. In so holding, the Ninth Circuit has expressed its concern that a contrary view

would "essentially nullify the statute of limitations by permitting renewed challenges with every denial of an application, long after six years had passed." *Wind River,* 946 F.2d at 714 (citing *Shiny Rock,* 906 F.2d at 1365).

However, the Ninth Circuit noted that challenges to agency action alleging the agency exceeded its constitutional or statutory authority, by their nature, will often require a more "interested" person than generally will be found in the public at large. *Wind River,* 946 F.2d at 715. Therefore the Court held in *Wind River Mining Corp. v. United States,* 946 F.2d 710 (9th Cir.1991), that challenges alleging lack of agency authority "may be brought within six years of the agency's application of that decision to the specific challenger." *Id.* at 716.

■ The NPS promulgated the 9B Regulations in 1978. 43 Fed.Reg. 57822. It is uncontroverted the first application of the 9B Regulations to Plaintiffs' mineral estate occurred in 1982. Additionally, prior to promulgation of the 9B Regulations, the NPS regulated access to Plaintiffs' minerals through special use permits. Hence, Plaintiffs were on notice of Defendants' application of the 9B Regulations to Plaintiffs' mineral estate at least as early as 1982. The six year statute of limitations consequently expired in 1988. However, Plaintiffs did not file their complaint until 1994. Therefore, Plaintiffs' allegations as to the constitutionality of either the promulgation of the 9B Regulations and/or the application of those Regulations to Plaintiffs' mineral estate is time barred.

However, even if Plaintiffs' claims were not time barred, these claims, as discussed below, fail as a matter of law.

## 2. SUBSTANTIVE CONSIDERATIONS

### (a) Rule-Making Authority

Plaintiffs' challenge to federal regulation is two-fold: first Plaintiffs contest Defendants' authority to apply the 9B Regulations to their mineral estate; second Plaintiffs contest Defendants' power to promulgate the 9B Regulations. This section addresses Defen-

dants' statutory authority to promulgate the 9B Regulations. Sections (b) and (c) address Defendants' authority under the Padre Enabling Act and the Texas Consent Statute to apply the 9B Regulations to Plaintiffs' mineral estate.

The authority to manage and regulate federal property arises from the Property Clause of the United States Constitution, which provides that "Congress shall have the Power to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States ... " U.S. Const. Art. IV, ¶ 3, cl. 2. In *Kleppe v. New Mexico,* 426 U.S. 529, 96 S.Ct. 2285, 49 L.Ed.2d 34 (1976), the Supreme Court upheld an expansive reading of that authority, stating "while the furthest reaches of the power granted by the Property Clause have not yet been definitively resolved, we have repeatedly observed that '[t]he power over the public lands thus entrusted to Congress is without limitations.'" *Id.* at 539, 96 S.Ct. at 2291 (quoting *United States v. San Francisco,* 310 U.S. 16, 29, 60 S.Ct. 749, 756, 84 L.Ed. 1050 (1940)).

Pursuant to the Property Clause, Congress created the National Park System by enacting the National Park Service Organic Act. 16 U.S.C. § 1 *et seq.* The Organic Act mandates the Park Service "promote and regulate" the National Parks:

> as provided by law, by such means and measures as to conform to the fundamental purpose of the parks ... which purpose is to conserve the scenery and the natural and historic objects and the wild life therein to provide for the enjoyment of the same *in such manner and by such means as will leave them unimpaired for the enjoyment of future generations.*

16 U.S.C. § 1 (emphasis added).

The Organic Act further states, "[t]he Secretary of the Interior shall make and publish such rules and regulations as he may deem necessary or proper for the use of the parks ... under the jurisdiction of the National Park Service." 16 U.S.C. § 3.

Therefore Congress not only authorized the Secretary to promulgate regulations for the purpose of preserving and protecting National Parks, but also directed the Parks be managed to achieve that purpose unless otherwise directly and specifically ordered by Congress. 16 U.S.C. § 1a–1.

Pursuant to the Organic Act, the NPS promulgated the 9B Regulations in 1979, "to prevent or minimize damage to the environment and other resource values, and to insure to the extent feasible that all units of the National Park System are left unimpaired for the enjoyment of future generations." 36 C.F.R. § 9.30(a). The Court finds no evidence the 9B Regulations were promulgated in the absence of statutory authority. Additionally, such a claim, as discussed above, is barred by the statute of limitations.

### (b) Padre Enabling Act

Plaintiffs argue Congress did not authorize application of the 9B Regulations to their mineral estate. Plaintiffs contend Section 4 of the Padre Enabling Act *expressly* precludes federal regulation of their mineral estate. Section 4 Part (b) states:

> Any acquisition hereunder shall exclude and shall not diminish any right of occupation or use of the surface under grants, leases, or easements, existing on April 11, 1961, which are reasonably necessary for the exploration, development, production, storing, processing, or transporting of oil and gas minerals that are removed *from outside the boundaries* of the national seashore and the Secretary may grant additional rights of occupation or use of the surface for the purposes aforesaid upon the terms and under such regulations as may be prescribed by him.

16 U.S.C. § 459d–3(b) (emphasis added).

Plaintiffs argue because the United States acquired only the surface estate of the National Seashore, Plaintiffs' mineral estate lies "outside the boundaries" of the National Seashore. However, such an interpretation contradicts Congress' statutory designation of the boundaries of the National Seashore described in Section 1 of the Padre Enabling Act, 16 U.S.C. § 459d. These boundaries are described in lateral terms by various maps, surveys and natural features. No privately owned interest in such property is described

as outside the boundaries of the National Seashore.

Section 2 of the Padre Enabling Act indicates Congress specifically contemplated some privately owned property would lie within the established boundaries of the National Seashore. Section 2 states: "The Secretary ... is authorized to acquire ... the land, waters, and other property, and improvements thereon and any interest therein, within the areas described in section 459d of this title or which lie *within the boundaries* of the seashore ... " 16 U.S.C. § 459d–1 (emphasis added). Congress therefore recognized a distinction between establishing boundaries and acquiring title, and presupposed boundaries of the National Seashore would be established without regard to title ownership of land within those contiguous boundaries. Additionally the July 15, 1966, Federal Register Notice establishing the boundaries of the National Seashore states federal civil and criminal jurisdiction extends "over all lands and waters, whether or not federally owned, with the boundaries" set forth by Congress in the Padre Enabling Act. 31 Fed.Reg. 9609.

Courts have recognized the difference between the statutory boundaries of National Parks, and title ownership to property within those boundaries. In *United States v. Stephenson,* 29 F.3d 162 (4th Cir.1994), for example, the Fourth Circuit upheld conviction of a defendant for unlawfully hunting bear "within the limits" of the Great Smoky Mountains National Park, even though the operative acts occurred on land owned by the Tennessee Valley Authority, but situated within the statutory boundaries of the Park. The court held the language "within the limits of said Park" contained in the statute banning hunting "refers to the statutory boundaries of the Park established by Congress, not to property ownership lines." Thus the court stated "[t]he primary inquiry ... must therefore be whether [the] area is within the statutory boundaries of the Park, not whether the NPS holds title to the land in question." *Id.* at 164. *See also Macomber v. Bose,* 401 F.2d 545, 547 (9th Cir.1968) (stating the language "the territory embraced within Glacier National Park" in-

cludes not only the public lands dedicated to park purposes by the United States but all privately owned lands within the described boundaries) and *Free Enterprise Canoe Renters Ass'n v. Watt,* 711 F.2d 852, 856 (8th Cir.1983) (the phrase "within the boundaries" is unambiguous and stating that "[t]he boundaries of the ONSR [Ozark National Scenic Riverways] incorporate federal, state, and private land, and the regulation makes no distinctions on the basis of ownership. Given the recognized federal power to regulate nonfederal land, there is no reason to doubt the Park Service's interpretation of its own regulation, which is that it covers all the ONSR area, not just the portions federally owned").

██ Based upon the statutory boundaries of the National Seashore, 16 U.S.C. § 459d, as well as the above case law, the Court finds Plaintiffs' mineral estate is located within the boundaries of the National Seashore. Because 4(b) applies only to minerals located outside the National Seashore, section 4(b) of the Padre Enabling Act does not apply to Plaintiffs' mineral estate.

In the alternative, Plaintiffs argue Section 4 of the Padre Enabling Act has no application to their mineral estate, thereby precluding federal regulation. Section 4 of the Padre Enabling Act contains parts (a) and (b). As discussed above, Part (b) does not apply to Plaintiffs' mineral estate. Part (a) states:

When acquiring land, waters, or interests therein, the Secretary shall permit a reservation by the grantor of all or any part of the oil and gas minerals in such land or waters and of other minerals therein which can be removed by similar means, with the right of occupation and use of so much of the surface of the land or waters as may be required for all purposes reasonably incident to the mining or removal of such from beneath the surface of these lands and waters and the lands and waters adjacent thereto, *under such regulations as may be prescribed by the Secretary with respect to such mining or removal.*

16 U.S.C. § 459d–3(a) (emphasis added).

Both parties agree 4(a) does not apply to Plaintiffs' mineral estate because this section applies only to minerals reserved in a con-

veyance from the surface owner who also owned the underlying minerals. Because Plaintiffs did not own the surface estate at the time of conveyance to the United States, 4(a) is inapplicable.

Plaintiffs therefore assert that if Congress intended federal regulation of their mineral estate, Congress would have included a "4(c)" to the Padre Enabling Act, specifically conferring such authority on the NPS. However, inclusion of a "4(c)" was unnecessary, since Congress had already vested the NPS with authority to regulate Plaintiffs' mineral estate.

Section 1a–1 of the National Park Service Organic Act states:

> The authorization of activities shall be construed and the protection, management, and administration of these areas shall be conducted in light of the high public value and integrity of the National Park System, and shall not be exercised in derogation of the values and purposes for which these various areas have been established, *except as may have been or shall be directly and specifically provided by Congress.*

16 U.S.C. § 1a–1.

■ Therefore, unless Congress intended to specifically exempt Plaintiffs' mineral estate from federal regulation, Plaintiffs' mineral estate would not be enumerated in a "4(c)" under the Padre Enabling Act. Consequently, the converse of Plaintiffs' argument is true. It is not, as Plaintiffs argue, that in order to be *included* under the federal regulatory scheme, Congress must have expressly enumerated Plaintiffs' mineral estate in the Padre Enabling Act. Instead, in order to be *excluded* from the reach of federal regulation, Congress must have "directly and specifically provided" for such exemption. 16 U.S.C. § 1a–1. This Congress did not do. Therefore, Plaintiffs' mineral estate is not exempt from application of the 9B Regulations.

Finally, Plaintiffs argue Section 5 of the Padre Enabling Act exempts federal regulation of their mineral estate. Section 5 states:

> Except as otherwise provided in sections 459d to 459d–7 of this title, the *property acquired* by the Secretary under such sections shall be administered by the Secretary, subject to sections 1 and 2 to 4 of this title, as amended and supplemented, and in accordance with other laws of general application relating to the areas administered and supervised by the Secretary throughout the National Park System.

16 U.S.C. § 459d–4 (emphasis added).

■ Plaintiffs argue their mineral estate does not constitute "property acquired by the Secretary", therefore federal regulation is prohibited. However, the language "property acquired" relates to the federally owned surface estate on the National Seashore. Section 5 instructs the NPS to administer this surface estate in accordance with the general federal regulatory provisions relating to National Parks. Hence, Section 5 does not preclude federal regulation of Plaintiffs' mineral estate.

### (c) Texas Consent Statute

#### (i) Statutory Language

■ Plaintiffs argue the Texas Consent Statute (TCS), Tex.Civ.Stat.Ann. § 6077t (Vernon 1970), specifically precludes federal regulation of their mineral estate. Plaintiffs contend the federal government agreed to this abdication of authority in exchange for the State of Texas' consent to federal acquisition of the National Seashore surface estate. Additionally, Plaintiffs contend the Padre Enabling Act incorporated the TCS, making the TCS federal law.

Section 3 of the TCS states:

> In all conveyances of said Park property under Sections 3 and 6 hereof to the United States of America, the Secretary of the Interior shall permit a reservation by the grantor of all oil, gas, and other minerals in such land or waters with the right of occupation and use of so much of the surface of the land or waters as may be required for the purposes of reasonable development of oil, gas and other minerals, under such rules and regulations as may be established by the Railroad Commission of the State of Texas.

*Id.* at sec. 3. Utilizing this language, Plaintiffs argue the Texas legislature mandated

state law, rather than federal law, would apply to Plaintiffs' mineral estate.

■■■ However, consent of the State legislature is not necessary for ownership of land by the United States government, but is "necessary only to a transfer of exclusive jurisdiction." *Curry v. State*, 111 Tex.Crim. 264, 12 S.W.2d 796 (1928). Second, it is clear Texas consented to the creation of the National Seashore with the knowledge the United States intended to regulate the occupation and use of the surface estate to protect those lands for park purposes. Section 3 of the Texas Consent Statute states: "It is the intention of the Legislature of the State of Texas that the use of said land for [mineral development and exploration] be carried out in such a manner as to not unreasonably interfere with the use of said lands for park purposes." Tex.Civ.Stat.Ann. § 6077t at sec. 3.

The Texas legislature also required the Texas Railroad Commission to "submit a copy of any proposed rules and regulations affecting the National Seashore ... to the United States Department of Interior, Washington, D.C.". *Id.* Therefore, the Texas legislature clearly envisioned concurrent regulation of the National Seashore with the federal government.

The Court finds the TCS simply codifies Texas' grant to the federal government of state owned land. Section 2 of the Padre Enabling Act provides: "[a]ny property, or interest therein, *owned by the State of Texas or political subdivision thereof* may be acquired only with the concurrence of such owner." 16 U.S.C. § 459d–1a (emphasis added). However, nowhere within the Padre Enabling Act does Congress place a similar concurrence requirement upon the Secretary of the Interior for acquisition of privately owned property or property interests.

The TCS provides for the right of concurrent jurisdiction with the federal government over any lands acquired for the National Seashore relating to civil and criminal jurisdiction, process, levy and collection of taxes, mineral development, and voting rights. Tex.Civ.Stat.Ann. § 6077t sec. 3, 6. However, not only is there no explicit requirement by the Texas State legislature that federal regulation not apply to the National Seashore, but the Texas legislature codified its intent that the National Seashore be preserved for park purposes. *Id.* at sec. 3.

In addition, Plaintiffs argue Section 6 of the Texas Consent Statute precludes federal regulation of their mineral estate. Section 6 states:

> The United States of America, through the Secretary of the Interior, is hereby authorized to purchase, condemn, receive, hold, and acquire title to the surface estate of any land not owned by the state in the area above-described as the Padre Island National Seashore for use as a recreational park; provided the acquisition of lands in such area *shall not deprive* the grantor or successor in title of the right of ingress and egress for the purpose of exploring for, developing, processing, storing and transporting minerals from beneath said lands and waters with the right of housing employees for such purposes.

Tex.Civ.Stat.Ann. § 6077t sec. 6.

[15] Plaintiffs argue NPS regulation of their mineral estate deprives Plaintiffs of the right of ingress and egress to their property, thereby violating the TCS. However, for the reasons stated within this Order, the Court finds the NPS has both the power and authority to reasonably regulate Plaintiffs' access to their mineral estate on the National Seashore. If such regulation is unreasonable or amounts to a deprivation of access to Plaintiffs' mineral estate, such regulation constitutes a Fifth Amendment takings claim. As discussed later in this Order, this Court has no jurisdiction to hear Plaintiffs' takings claim.

### *(ii) Legislative Intent*

Plaintiffs, in an attempt to support their reading of the TCS and Padre Enabling Act, cite individual statements made during Senate hearings and submit an affidavit by former Congressman Kilgore.

[16] However, resort to legislative history is only utilized where the statutory language is "inescapably ambiguous". *Garcia v. United States,* 469 U.S. 70, 76 n. 3, 105 S.Ct.

479, 483 n. 3, 83 L.Ed.2d 472 (1984), *reh'g denied,* 469 U.S. 1230, 105 S.Ct. 1235, 84 L.Ed.2d 371 (1985) (citing *Schwegmann Bros., v. Calvert Distillers Corp.,* 341 U.S. 384, 395–96, 71 S.Ct. 745, 751, 95 L.Ed. 1035 (1951) (concurring)). The Court does not find the statutory language of the TCS, Padre Enabling Act or the Organic Act ambiguous, therefore resort to legislative history is unnecessary. Nonetheless, an analysis of legislative history supports a finding of legislative intent to subject Plaintiffs' mineral estate to federal regulation.

Plaintiffs submit statements by Senator Yarborough and a witness during congressional hearings on the Padre Enabling Act. Statements by individual legislators or witnesses during legislative debates or hearings are not determinative of legislative intent. *Consumer Product Safety Comm'n v. GTE Sylvania, Inc.,* 447 U.S. 102, 118, 100 S.Ct. 2051, 2061, 64 L.Ed.2d 766 (1980) ("even the contemporaneous remarks of a single legislator who sponsors a bill are not controlling in analyzing legislative history").

Likewise, the after-the-fact affidavit by former Representative Joe Kilgore is not determinative of legislative intent. The Fifth Circuit has stated: "The retroactive wisdom provided by the subsequent speech of a member of Congress stating that yesterday we meant something that we did not say is an ephemeral guide to history." *Rogers v. Frito–Lay, Inc.,* 611 F.2d 1074, 1080 (5th Cir.), *cert. denied,* 449 U.S. 889, 101 S.Ct. 246, 66 L.Ed.2d 115 (1980). Although, these statements are not controlling, the Court may consider their relevance in determining legislative intent. *Consumer Product Safety Comm'n v. GTE Sylvania, Inc.,* 447 U.S. at 118, 100 S.Ct. at 2061.

Defendants cite the report of the Senate Committee on Interior and Insular Affairs recommending passage of the Padre Enabling Act. The Committee recognized development of private oil and gas estates would be subject to federal regulation. The Committee stated:

> Oil and gas exploration and production, both on the island and off shore, are proceeding rapidly, and it is almost certain that all mineral rights on Padre Island are under lease. It also appears that most of the mineral rights have been separated from the surface ownership. While petroleum activity poses a definite problem, *it is believed that much can be done to lessen its interference with scenic and recreational values and to reconcile the two uses of the island for the duration of the oil and gas recovery period through cooperative effort.*

Sen.Rpt. No. 1226, at 11 (emphasis added). The Committee further stated:

> It is the judgment of the Department of the Interior, concurred in by the committee, that the continued operation of this segment of the oil and gas industry will not impair the development of the island for recreational purposes. Oil and gas activities in the area are relatively unobtrusive and, *under reasonable regulations prescribed by the Secretary of the Interior,* should pose no threat to the recreational pursuits on Padre Island.

*Id.* at 12–13 (emphasis added).

The Supreme Court has held "Committee Reports are 'more authoritative' than comments from the floor." *Garcia,* 469 U.S. at 76, 105 S.Ct. at 483. Therefore, although comments of individual congressional members submitted by Plaintiffs may be used as some evidence of legislative intent, where these statements contradict language found in Committee Reports, the Court applies the "more authoritative" intent expressed in the Reports. In this case, the Court finds clear legislative intent within the Committee Reports to subject Plaintiffs' mineral estate to federal regulation.

**(d) Federal Pre—Emption**

Lastly, Plaintiffs argue case law supports their position that Texas state law, rather than federal law, governs their mineral estate.

*(i) Case Law*

Under Texas state law the mineral estate is dominant to the surface estate. *Vest v. Exxon Corp.,* 752 F.2d 959, 961 (5th Cir.1985); *Ball v. Dillard,* 602 S.W.2d 521,

523 (Tex.1980). The mineral owner has the right to explore, develop, and transport minerals, including the right to use so much of the surface estate as is reasonably necessary. *Id.*:

Plaintiffs rely upon four cases to argue federal law does not preempt state law. The first case is *Duncan v. U.S. Forest Service,* No. A1–93–033, 1993 WL 664644 (D.N.D. September 30, 1993). In *Duncan* the North Dakota district court held state law governed a developer's use of the mineral estate located beneath federal land. However, the Eighth Circuit reversed this decision on March 21, 1995. *Duncan Energy Company v. United States Forest Service,* 50 F.3d 584 (8th Cir.1995), *reh'g denied,* (June 5, 1995). The Eighth Circuit held that although the mineral estate is the dominant estate under North Dakota law, Congress has the power under the Property Clause to regulate federal land.

The second case Plaintiffs rely upon is *United States v. Minard Run Oil Co.,* Civil Action No. 80–129, (W.D.Pa.1980). Plaintiffs cite *Minard Run* for the proposition that under state law, the United States is treated as any other land owner. However, in *Minard Run,* the United States specifically disclaimed any intention of proceeding as a sovereign. In this case, Defendants specifically invoke their sovereignty. Therefore, *Minard Run* is not helpful to Plaintiffs' position.

Plaintiffs' third case is *Belville Mining Co. v. United States,* 763 F.Supp. 1411 (S.D.Ohio 1991), *aff'd in part, rev'd in part on other grounds,* 999 F.2d 989 (6th Cir.1993). In *Belville* the United States prohibited strip mining within the boundaries of the national forest, thus preventing plaintiffs from extracting their minerals. Here, Defendants do not seek to prevent Plaintiffs from extracting their minerals, but simply seek to regulate use of the federally owned surface estate.

Finally, Plaintiffs rely upon *North Dakota Wildlife Federation v. United States Forest Service and Enron Oil & Gas Co.,* Civil No. A1–88–189 (D. N.D. filed September 1, 1988), where environmental groups sued the Forest Service and defendant Enron Oil and Gas Co.

(Enron) to prevent oil and gas exploration. Plaintiffs alleged Defendant Enron did not receive approval from the Forest Service prior to conducting oil and gas exploration. Judge Conmy, the district judge who decided *Duncan,* held that Enron, as owner of the dominant mineral estate, was not subject to federal regulation. However, the Eighth Circuit's decision in *Duncan* clearly reverses the reasoning applied in *Enron.* Additionally, the Supremacy Clause operates to preempt application of state law.

### *(ii) Supremacy Clause*

■ To the extent state law conflicts with federal regulatory authority under the Property Clause, federal law must prevail under the Supremacy Clause. *Kleppe v. New Mexico,* 426 U.S. 529, 543, 96 S.Ct. 2285, 2293, 49 L.Ed.2d 34, *reh'g denied,* 429 U.S. 873, 97 S.Ct. 189, 50 L.Ed.2d 154 (1976) (federal regulations pursuant to the Property Clause "necessarily override[ ] conflicting state laws under the Supremacy Clause").

Plaintiffs argue the Supremacy Clause does not apply to this case, because there is no "clear and manifest" intent of Congress to preempt state law. *California v. A.R.C. America Corp.,* 490 U.S. 93, 101, 109 S.Ct. 1661, 1665, 104 L.Ed.2d 86 (1989) (quoting, *Rice v. Santa Fe Elevator Corp.,* 331 U.S. 218, 230, 67 S.Ct. 1146, 1152, 91 L.Ed. 1447 (1947)).

However, as discussed above, the Property Clause gives Congress authority to regulate and manage the federal surface lands at issue here, which are part of the National Park System. The question, then, is whether that statutory authority, and the Park Service's regulations implementing that authority, preempt Texas law as it governs the mineral developer's right to use the federal surface.

General pre-emption standards are well established:

[S]tate law can be pre-empted in either of two general ways. If Congress evidences an intent to occupy a given field, any state law falling within that field is pre-empted. If Congress has not entirely displaced state regulation over the matter in question, state law is still pre-empted to the

extent it actually conflicts with federal law, that is, when it is impossible to comply with both state and federal law, or where the state law stands as an obstacle to the accomplishments of the full purposes and objectives of Congress.

*Silkwood v. Kerr–McGee Corp.*, 464 U.S. 238, 248, 104 S.Ct. 615, 621, 78 L.Ed.2d 443 (1984) (citations omitted); *Hodges v. Delta Airlines, Inc.*, 44 F.3d 334 (5th Cir.1995).

Clearly Congress has not preempted the entire field, to preclude all state regulation of federal lands acquired and managed under the Park Service Organic Act, Padre Enabling Act, and other federal statutes. *See Kleppe v. New Mexico*, 426 U.S. at 543, 96 S.Ct. at 2293. Nevertheless, to the extent Texas law allows mineral developers unrestricted access and prohibits the Park Service from regulating the surface estate, such law directly precludes the Park Service from carrying out statutorily mandated duties under the Park Service Organic Act, Padre Enabling Act, and other federal statutes. Both the federal regulatory scheme and Texas law "address the same subject matter and activity," *ANR Pipeline Co. v. Iowa State Commerce Com'n*, 828 F.2d 465, 471 (8th Cir.1987), and are in direct conflict with respect to the mineral developer's use of federal lands. To that extent, Texas law is preempted by the federal regulatory scheme governing federal surface lands.

### 3. DEFENDANTS' MOTION TO DISMISS

As an alternative pleading, Plaintiffs seek a determination that Defendants' regulation of Plaintiffs' mineral estate constitutes a taking under the Fifth Amendment to the United States Constitution, entitling Plaintiffs to just compensation.

However, under the Tucker Act, 28 U.S.C. §§ 1346(a)(2) and 1491(a), this Court lacks jurisdiction over Plaintiffs' takings claim. Plaintiffs stipulated at the Summary Judgment hearing that any such taking would amount to over $10,000.00. Where takings claims against the federal government amount to more than $10,000, the Tucker Act vest subject matter jurisdiction exclusively in the Court of Federal Claims. *Id.;*

*Amoco Production v. Hodel*, 815 F.2d 352, 359 (5th Cir.1987), *cert. denied*, 487 U.S. 1234, 108 S.Ct. 2898, 101 L.Ed.2d 932 (1988).

Defendants move to dismiss Plaintiffs' takings claim for lack of jurisdiction. However, where the district court lacks jurisdiction over a takings claim, the Court has the discretion to transfer the claim to the United States Court of Federal Claims. 28 U.S.C. § 1631. Section 1631 provides in pertinent part:

Whenever a civil action is filed in a court ... and that court finds that there is a want of jurisdiction, the court shall, if it is in the interest of justice, transfer such action or appeal to any other such court in which the action or appeal could have been brought....

28 U.S.C. § 1631. .

The Court finds it is in the interest of justice to transfer Plaintiffs' takings claim to the Court of Federal Claims. The Court therefore GRANTS Plaintiffs' Motion to Sever their takings claim and the Court hereby TRANSFERS said claim to the Court of Federal Claims pursuant to 28 U.S.C. § 1631. In so transferring, the Court notes that Corpus Christi, Texas, is the situs of this dispute and that the majority of witnesses are located in Corpus Christi. In its decision to transfer, the Court considered Defendants' representation that the Court of Federal Claims may sit in Corpus Christi, Texas, to hear this claim.

### V. CONCLUSION

For the above stated reasons the Court Orders as follows: (1) the Court DENIES Plaintiffs' Motion for Summary Judgment; (2) the Court GRANTS Defendants' Motion for Summary Judgment; (3) the Court DENIES Defendants' Motion to Dismiss Takings Claim; (4) the Court GRANTS Plaintiffs' Motion to Sever Takings Claim; and (5) the Court TRANSFERS Plaintiffs' Takings Claim to the Court of Federal Claims.